<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

JAMES R. SMITH,                    :
                                   :   Civil Action No. 09-2602 (FLW)
            Plaintiff,             :
                                   :
                                   :
            v.                     :   **OPINION**
                                   :
GEORGE W. HAYMAN, et al.,          :
                                   :
            Defendants.            :


**APPEARANCES:**

      JAMES R. SMITH, Plaintiff <u>pro</u> <u>se</u>
      #423443
      New Jersey State Prison
      P.O. Box 861
      Trenton, New Jersey 08625-0861

**WOLFSON**, District Judge

      Plaintiff, James R. Smith, a state inmate currently confined
at the New Jersey State Prison in Trenton, New Jersey, seeks to
bring this action <u>in</u> <u>forma</u> <u>pauperis</u>.  Based on his affidavit of
indigence and the absence of three qualifying dismissals within
28 U.S.C. § 1915(g), the Court will grant plaintiff's application
to proceed <u>in</u> <u>forma</u> <u>pauperis</u> ("IFP") pursuant to 28 U.S.C.
§ 1915(a) (1998) and order the Clerk of the Court to file the
Complaint.

      At this time, the Court must review the Complaint, pursuant
to 28 U.S.C. §§ 1915(e)(2) and 1915A, to determine whether it
should be dismissed as frivolous or malicious, for failure to

state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief.  For the reasons set forth below, the Court concludes that the Complaint should proceed in part.

Smith also filed a motion for preliminary injunctive relief. For the reasons stated below, this relief will be denied without prejudice.

## I.   BACKGROUND

Plaintiff, James R. Smith ("Smith"), brings this civil action, pursuant to 42 U.S.C. § 1983, against the following defendants: George W. Hayman, Commissioner of the New Jersey Department of Corrections ("NJDOC"); Michelle Ricci, Administrator of the New Jersey State Prison ("NJSP"); Dr. Rusty Reeves, Director of Psychiatry throughout the New Jersey correctional facilities; Dr. Jordan Lieberman, N.J. Regional Director of Psychiatry; Dr. Flora DeFilippo, NJSP Lead Psychiatrist; Dr. Ray Baum, NJSP Psychiatrist; Dr. Marina Moshkovich, NJSP Psychiatrist; Ms. Keasha Baldwin, NJSP Clinical Social Worker; and John and Jane Does # 1-20.  (Complaint, Caption and ¶¶ 15-23).  The following factual allegations are taken from the Complaint, and are accepted for purposes of this screening only.  The Court has made no findings as to the veracity of plaintiff's allegations.

      Smith alleges that he suffers from a Gender-Identity Disorder ("GID").  He is a male-to-female transgender individual, namely, he was born biologically male but allegedly is psychologically and emotionally female.  (Complaint, ¶¶ 13, 14). Smith states that, on or about June 12, 2007, he first told Dr. Michael Jordan about his about his male-to-female ("MtF") GID and asked that this issue be noted on plaintiff's mental health record, which was never done.  Smith also talked to Dr. Jordan about his MtF GID, but no course of action was taken.  (Compl., ¶¶ 81-82).

On December 13, 2007, Smith told defendant Baldwin about his MtF GID and verbally requested treatment.  Smith saw Baldwin every two weeks thereafter and asked her each time for treatment, which was denied each and every time.  (Compl., ¶ 83).

On January 4, 2008, Smith wrote to Dr. DeFilippo, explaining to him about plaintiff's MtF GID issues and requesting types of hormone therapy and to receive female clothing and amenities. These requests were denied.  On February 11, 2008, Smith saw defendant Baldwin and again asked about getting proper treatments for his GID.  (Compl., ¶¶ 84-85).  Smith alleges that Baldwin told him that "they will not diagnose nor treat [Smith] for [his] GID and that [] it would be better if [Smith were to just forget about this whole thing."  (Compl., ¶ 86).

Smith filed an administrative grievance on February 13, 2008, through the NJDOC Inmate Remedy System, complaining about the refusal to treat him for his MtF GID.  A response was received on February 26, 2008, Assigned case No. 08-02-444, stating that "Inmate has refused to discuss this with treating psychiatrist.  He must talk to her - based on evaluation we will recommend as appropriate course of action."  Smith appealed the decision to NJSP Administrator Ricci, which was denied on March 4, 2008, with a recommendation for plaintiff to "comply with treatment plans."  He appealed this decision before the Superior Court of New Jersey, Appellate Division in James Randall Smith v. New Jersey Department of Corrections, Docket No. A-4127-07T2, on April 25, 2008.[1]  On October 20, 2008, the matter was remanded to the NJDOC for clarification of their written decision on Smith's administrative remedy form.  (Compl., ¶¶ 30, 34, 40, 86-90).

Smith contends that there have been no treatment plans devised for his compliance.  Further, he had requested that privacy and confidentiality concerns be addressed in devising a course of treatment.  In response, on March 10, 2008, Smith saw

---

[1]  The issues raised on appeal included: (1) respondents failed to provide appellant with adequate privacy and confidentiality to enable him to discuss his GID issues with members of the prison Mental Health Department; (2) respondents refused treatments for GID; (3) respondents refused to provide medical and mental health care; and (4) respondents showed deliberate indifference to appellant's medical and mental health needs.

Baldwin who stated to him "that she has plans of terminating the plaintiff's status as a Special Needs Inmate." Upon hearing this, Smith asked Baldwin to advise Dr. Moshkovich that plaintiff wanted to speak to him. (Compl., ¶¶ 91-92).

On March 12, 2008, Dr. Moshkovich visited Smith at his cell. Dr. Moshkovich advised plaintiff that due to a current lockdown of the prison for an "Institutional Power Check," she was unable to arrange a meeting with plaintiff outside of his cell to speak with him about his MtF GID. On April 9, 2008, Dr. Moshkovich again met with plaintiff. On this occasion, she met with Smith in the middle of the housing unit in plain view and hearing of other staff and inmates. Dr. Moshkovich had asked the unit floor officer if he could hear her conversation with plaintiff and the officer replied "no." However, Dr. Moshkovich asked the officer to move further away to ensure privacy. Smith contends that the doctor failed to consider that the officer in the booth can turn on the unit microphone and hear the conversation and other inmates whose cells are located directly in viewing and hearing distance, can hear the conversation. (Compl., ¶¶ 93-95).

Nevertheless, Smith spoke to Dr. Moshkovich "about his feeling in detail, describing his MtF GID issues; sexual impulses and fantasies; anxiety and depression from not having the proper clothing and cosmetics and with having to live with male genitalia; his ardent desire to tuck the male genitalia beneath

his legs so he's not able to see them, and the constant urge to play with his rectum with foreign objects to seek relief from not being able to have sex as a normal female." (Compl., ¶ 96).  Dr. Moshkovich prescribed an anti-depressant medication, "Paxil, 20 mg" to treat Smith's depression, although Paxil does not treat or cure GID.  She explained to Smith that sex-reassignment surgery ("SRS") is not provided for inmates, however, the doctor did speak briefly about the possibility of castration.  Plaintiff had no further discussion with Dr. Moshkovich.  (Compl., ¶¶ 97-99).

On April 28, 2008, plaintiff saw Baldwin and asked her if she had disclosed his MtF GID issue to the housing unit officers. Baldwin stated that she did not, but that the issue had to be disclosed due to the "environment."  Baldwin never stated who she notified or who released the information.  Smith complained to Baldwin that ever since he told her and Dr. Moshkovich about his GID , "the housing unit officers have been constantly looking into my cell and everytime I leave my cell, either to get a shower or to get my meals, they follow my every move."  Smith also stated that he "has been subjected to constant cell searches by second shift housing unit officers, who rifle through his legal documents and other paperwork, looking for anything relating to his GID."  (Compl., ¶ 100).

On April 29, 2008, Dr. Moshkovich increased plaintiff's Paxil dosage from 20 mg to 30 mg.  Smith gave a list of questions to Dr. Moshkovich to which the doctor replied no to every

6

question.  Smith also asked Dr. Moshkovich who she told about plaintiff's GID.  Moshkovich replied that she told her supervisors.  Moshkovich also told Smith that she would only treat Smith with Paxil, which she would increase until his desire to be female disappears.  Dr. Moshkovich was eventually reassigned to another part of the prison, and no other psychiatrist was provided to treat plaintiff, and when his Paxil prescription ran out, it was not renewed.  (Compl., ¶¶ 101-104).

On December 5, 2008, Smith was seen by Dr. Ray Baum, a psychiatrist, concerning his GID.  Dr. Baum had been directed by the Regional Director to conduct an interview with plaintiff.  At that time, plaintiff asked Dr. Baum about receiving hormones, and women's clothing and amenities.[2]  Dr. Baum told plaintiff that he will address these concerns in his report.  Dr. Baum also asked if plaintiff would be willing to take a "Personality Test" to be administered by Dr. Jordan.  Plaintiff agreed and took the "Rorschach Inkblot Test" on January 8, 2009, and a "Personality Assessment Inventory Test" on January 9, 2009.  Smith had to

---

[2]  In July 2008, plaintiff had submitted an application for a name change to the Superior Court of New Jersey, law Division, Mercer County, to legally change his name.  [In the Matter of Application of James Randall Smith to Assume the name of Amands Raquel Smith, Docket No. MERL-1830-08].  The Cape May County Prosecutor filed a Notice of Objection to the Name Change request.  On February 10, 2009, plaintiff received a final order denying his application for a name change, which Order was dated January 29, 2009.  Smith provides this information for purposes of showing his "desperate desire to legally change his name to his feminine name."  (Compl., ¶¶ 67-77).

retake the Rorschach test on January 16, 2009.  (Compl., ¶¶ 41-48).

On January 24, 2009, Smith received an Office of the Administrator Memorandum, dated January 21, 2009, regarding his appeal before the Appellate Division, James Randall Smith v. New Jersey Department of Corrections, Docket No. A-4127-07T2.  The Memorandum states that: "According to reports submitted by Dr. Baum, Psychiatrist, you do not meet the two major criteria diagnosis based on the following.  Namely, a strong identification with the opposite sex, and a high level of discomfort with your body, that is seen in this disorder."  The report further stated that Smith had "agreed to psychological testing.  This could possibly provide more insight into [Smith's] claims and concerns, and could provide objective findings." Lastly, the Memorandum stated, "Based on the foregoing, it is the department's conclusion that you do not meet the diagnostic criteria for Gender Identity Disorder."   (Compl., ¶¶ 49, 52-54).

On January 26, 2009, plaintiff submitted inmate remedy forms to interview with Dr. Baum and discuss his reports, and to obtain a second opinion and evaluation because he disagreed with Dr. Baum's conclusion.  (Compl., ¶¶ 55, 56).

On February 4, 2009, Dr. Reeves and Dr. Lieberman visited plaintiff in response to his January 26, 2009 inmate remedy form. These doctors told plaintiff that the record did not indicate that plaintiff had GID, but did recommend one-to-one counseling sessions.  Smith told the doctors that there was no

confidentiality or privacy accorded him during these sessions, which prevented him from discussing his mental health issues. Plaintiff also expressed concern that the disclosure of his GID because of the "environment" violated N.J.A.C. 10A:16-4.4 (inmate/therapist confidentiality), and thus, he had "trust" issues with the Mental Health Department.  Dr. Reeves told plaintiff that he would see if plaintiff could be afforded privacy when talking to members of the Mental Health Service. Plaintiff received a combined response to both of his January 26, 2009 inmate remedy forms on February 19, 2009, which essentially stated that he had been seen by Dr. Reeves, the Director of Psychiatry, and Dr. Lieberman, Regional Director of Psychiatry, and that plaintiff's case had been discussed with plaintiff. (Compl., ¶¶ 57-62, 107-112).

On February 25, 2009, Smith filed his second appeal of a final administrative decision in the Superior Court of New Jersey, Appellate Division,  James Randall Smith v. New Jersey Department of Corrections, Docket No. A-003303-08T2, with respect to denial of his January 26, 2009 inmate remedy forms.  This appeal is still pending in the state appellate court at the time plaintiff filed his Complaint.  (Compl., ¶¶63-66).

On January 13, 2009, Smith submitted a petition for rulemaking at N.J.A.C. 10A:14 and 10A:16, to the NJDOC Administrative Rules Unit hoping to add to the New Jersey Administrative Code procedures for the treatment of individuals

with GID.  On January 23, 2009, his petition was denied. (Compl., ¶¶105, 106).

On March 4, 2009, defendant Ricci personally moved Smith from housing unit 3-A (a single man cell) to unit 4-L (a double cell) allegedly in retaliation for plaintiff's complaints, and "in hopes that the plaintiff would cause a ruckus so that the administration can place the plaintiff into lockup in hopes of quieting him."  (Compl., ¶ 113).  Smith further complains that this housing unit requires six men to shower at a time.  Smith specifically complains that Ricci has placed plaintiff's health, safety and well-being at risk by moving him from a single cell unit to a double cell unit, as well as further impeding his rights of privacy and confidentiality with respect to his GID issues.  (Compl., ¶¶ 113, 115-116).

Smith asserts that his First, Eighth, Ninth and Fourteenth Amendment rights have been violated.  In particular, he contends that he has been denied equal protection, that he has suffered retaliation and cruel and unusual punishment, and that his rights to privacy and confidentiality have been breached.

Smith seeks injunctive relief to be free from retribution and retaliation for the filing of this lawsuit, to be provided private and confidential meetings with members of the mental Health Department, to be removed from double-lock status, to be provided a specialist in the field of GID to determine the proper course of treatment, to be provided feminine clothing and

10

amenities and catalogs to purchase same, to provide plaintiff with "cross-sex hormones" and "feminizing hormones," and to have the NJDOC formulate rules and regulations permitting treatment of inmates suffering from GID.  Smith also seeks compensatory damages in excess of $100,000.00, and punitive damages in excess of $300,000.00.

## II.   STANDARDS FOR A SUA SPONTE DISMISSAL

The Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996), requires a district court to review a complaint in a civil action in which a prisoner is proceeding in forma pauperis or seeks redress against a governmental employee or entity.  The Court is required to identify cognizable claims and to sua sponte dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.  28 U.S.C. §§ 1915(e)(2)(B) and 1915A.  This action is subject to sua sponte screening for dismissal under both 28 U.S.C. § 1915(e)(2)(B) an § 1915A.

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007)(following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  See also United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must

11

"accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). The Court need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions." Id.

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)). The standard for evaluating whether a complaint is "frivolous" is an objective one. Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Haines, 404 U.S. at 521 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). See also Erickson, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009). The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in

discriminatory decisions regarding Iqbal's treatment during detention at the Metropolitan Detention Center which, if true, violated his constitutional rights.  <u>Id</u>.  The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." <u>Fed.R.Civ.P.</u> 8(a)(2).[3]  Citing its recent opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' "<u>Iqbal</u>, 129 S.Ct. at 1949 (quoting <u>Twombly</u>, 550 U.S. at 555), the Supreme Court identified two working principles underlying the failure to state a claim standard:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... .  Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." <u>Fed. Rule Civ. Proc.</u> 8(a)(2).

<u>Iqbal</u>, 129 S.Ct. at 1949-1950 (citations omitted).

---

[3]  Rule 8(d)(1) provides that "[e]ach allegation must be simple, concise, and direct.  No technical form is required." <u>Fed.R.Civ.P.</u> 8(d).

The Court further explained that

> a court considering a motion to dismiss can choose to begin
> by identifying pleadings that, because they are no more than
> conclusions, are not entitled to the assumption of truth.
> While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations.
> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they
> plausible give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must now allege "sufficient factual matter" to show that a claim is facially plausible. This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 1948. The Supreme Court's ruling in Iqbal emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible. Id. at 1949-50; see also Twombly, 505 U.S. at 555, & n.3; Fowler v. UPMC Shadyside, ___ F.3d ___, 2009 WL 2501662, *4 (3d Cir., Aug. 18, 2009).

Consequently, the Third Circuit observed that Iqbal provides the "final nail-in-the-coffin" for the "no set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[4] that applied to federal complaints before Twombly. Fowler, 2009 WL 2501662, *5. The Third Circuit now requires that a district

---

[4] In Conley, as stated above, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Id., 355 U.S. at 45-46. Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

court must conduct the two-part analysis set forth in Iqbal when
presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be
> separated.  The District Court must accept all of the
> complaint's well-pleaded facts as true, but may disregard
> any legal conclusions. [Iqbal, 129 S.Ct. at 1949-50].
> Second, a District Court must then determine whether the
> facts alleged in the complaint are sufficient to show that
> the plaintiff has a "plausible claim for relief." [Id.]  In
> other words, a complaint must do more than allege the
> plaintiff's entitlement to relief.  A complaint has to
> "show" such an entitlement with its facts.  See Phillips,
> 515 F.3d at 234-35.  As the Supreme Court instructed in
> Iqbal, "[w]here the well-pleaded facts do not permit the
> court to infer more than the mere possibility of misconduct,
> the complaint has alleged-but it has not 'show [n]'-'that
> the pleader is entitled to relief.'"  Iqbal, [129 S.Ct. at
> 1949-50].  This "plausibility" determination will be "a
> context-specific task that requires the reviewing court to
> draw on its judicial experience and common sense." Id

Fowler, 2009 WL 2501662, *5.

This Court is mindful, however, that the sufficiency of this
pro se pleading must be construed liberally in favor of
Plaintiff, even after Iqbal.  See Erickson v. Pardus, 551 U.S. 89
(2007).  Moreover, a court should not dismiss a complaint with
prejudice for failure to state a claim without granting leave to
amend, unless it finds bad faith, undue delay, prejudice or
futility. See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-
111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir.
2000).

### III.   SECTION 1983 ACTIONS

Smith brings this action pursuant to 42 U.S.C. § 1983.
Section 1983 provides in relevant part:

15

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory ... subjects, or causes to be subjected,
> any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

IV.  ANALYSIS

A.  Retaliation Claim

In Count Six, Smith is asserting a claim that defendant Ricci retaliated against him, in violation of his First and Fourteenth Amendment rights, for filing an administrative remedy and seeking treatment for his GID.  "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution ... ."  White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990).  To prevail on a retaliation claim, plaintiff must demonstrate that (1) he engaged in constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional]

rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action.  Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)). See also Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)); Thaddeus-X v. Blatter, 175 F.3d 378, 386-99 (6th Cir. 1999), cited with approval in Allah, 229 F.3d at 225.

Based on the allegations set forth in the Complaint, if true, Smith may be able to support a claim of retaliation.  He alleges that shortly after he sought treatments for his GID and filed administrative remedies when treatments were not provided, Ricci arbitrarily moved him from his single cell unit to a double-lock situation, where plaintiff is now prone to harassment, sexual advances and attacks, and is a target of serious harm and possible violence from other inmates.

A prisoner's ability to file grievances and lawsuits against prison officials is a constitutionally protected activity for purposes of a retaliation claim.  See Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981)(retaliation for exercising right to petition for redress of grievances states a cause of action for damages under the constitution); Woods v. Smith, 60 F.3d 1161, 1165 (5th Cir. 1995)(prison officials may not retaliate against an inmate for complaining about a guard's misconduct), cert. denied, 516 U.S. 1084 (1996).  Therefore, because plaintiff

alleges that the retaliation was the result of his filing grievances, he appears to meet the requisite elements of a retaliation claim.  Namely, Smith has alleged (1) a constitutionally protected activity, (2) that he was subjected to adverse action by defendant, Ricci, such as an arbitrary transfer from a single cell to a double-lock cell situation, and (3) that the filing of grievances was the motivating factor in Ricci's decision to take adverse action against plaintiff.  Accordingly, the Court will allow this claim to proceed at this time, as against defendant, Ricci.

B.   Eighth Amendment Retaliation/Failure to Protect Claim

Next, Smith argues that Ricci has violated his Eighth Amendment right against cruel and unusual punishment by her retaliatory placement of plaintiff in a double-lock cell without regard to his protection from harm.  The Eighth Amendment to the United States Constitution prohibits a State from inflicting "cruel and unusual punishments" on those convicted of crimes.  Rhodes v. Chapman, 452 U.S. 337 (1981).  The Supreme Court has construed the Eighth Amendment as prohibiting "conditions" that involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment.  Id. at 347.  The cruel and unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society."  Id. at 346 (quoting Trop v. Dulles, 356 U.S. 86, 101

(1956)).  To state a claim under the Eighth Amendment, an inmate must satisfy an objective element and a subjective element. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

The objective element questions whether the deprivation of a basic human need is sufficiently serious; the subjective component asks whether the officials acted with a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The objective component is contextual and responsive to "'contemporary standards of decency.'"  Hudson v. McMillian, 503 U.S. 1, 8 (1992).  The subjective component follows from the principle that "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'"  See Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297 (internal quotation marks, emphasis, and citations omitted)); Rhodes, 452 U.S. at 345.  What is necessary to establish an unnecessary and wanton infliction of pain varies also according to the nature of the alleged constitutional violation.  Hudson, 503 U.S. at 5.

Here, Smith appears to argue that Ricci, who is responsible for plaintiff's care and custody while plaintiff is incarcerated at New Jersey State Prison, has failed to protect him by placing plaintiff in a dangerous environment at a known or potential risk of serious harm.  In the context of a failure-to-protect claim, the inmate must show that he is "incarcerated under conditions posing a substantial risk of harm," Farmer, 511 U.S. at 833, and that prison officials knew of and disregarded the excessive risk

19

to inmate safety, Id. at 837.  "A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror."  Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985).  "Whether ... prison official[s] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that ... prison official[s] knew of a substantial risk from the very fact that the risk was obvious."  Farmer, 511 U.S. at 842. Deliberate indifference is more than a mere lack of ordinary due care, however; it is a state of mind equivalent to a reckless disregard of a known risk of harm.  Farmer, 511 U.S. at 834.

Smith alleges that Ricci is aware of plaintiff's GID issues and that this matter was made known to staff when plaintiff sought psychological and other treatment.  Accordingly, Plaintiff's publicized transsexualism would appear to place him at risk of serious harm from other inmates if housed in the same cell with another male, especially after plaintiff has requested women's clothing and amenities.  Moreover, the cell unit also requires eight or more inmates showering together, exposing plaintiff to the danger of attack.  These allegations, if true, may be sufficient, at this early screening stage, to withstand dismissal because the allegations tend to show that defendant was informed, knew, or should have known about plaintiff's GID and

20

his potential exposure to a risk of serious harm from the other inmates in the double-lock unit, and has done nothing to prevent or alleviate plaintiff's exposure to such potential harm.  See Nami, 82 F.3d at 67-68; Farmer, 511 U.S. at 842; accord Hamilton v. Leavy, 117 F.3d 742, 747-48 (3d Cir. 1997); Ingalls v. Florio, 968 F. Supp. 193, 199-200 (D.N.J. 1997).  Accordingly, plaintiff's Eighth Amendment failure to protect claim will be allowed to proceed against defendant Ricci at this time.

C.  Denial of Medical Care Claim

In Counts Four and Five of his Complaint, Smith alleges that he has been denied his right to medical care and treatment for his GID in violation of the Eighth Amendment, made applicable to the states through the Fourteenth Amendment.  The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  Estelle v. Gamble, 429 U.S. 97, 103-04 (1976); Rouse v. Plantier, 182 F.3d 192 (3d Cir. 1999).  In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege:  (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need.  Estelle, 429 U.S. at 106; Natale v. Camden County Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003).

To satisfy the first prong of the Estelle inquiry, the inmate must demonstrate that his medical needs are serious.

21

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  Hudson v. McMillian, 503 U.S. 1, 9 (1992).  The Third Circuit has defined a serious medical need as: (1) "one that has been diagnosed by a physician as requiring treatment;" (2) "one that is so obvious that a lay person would recognize the necessity for a doctor's attention;" or (3) one for which "the denial of treatment would result in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss."  Atkinson v. Taylor, 316 F.3d 257, 272-73 (3d Cir. 2003)(internal quotations and citations omitted); see also Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

     The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need.  See Natale, 318 F.3d at 582 (finding deliberate indifference requires proof that the official knew of and disregarded an excessive risk to inmate health or safety). "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm.  Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).  Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate

22

deliberate indifference.  Andrews v. Camden County, 95 F. Supp.2d 217, 228 (D.N.J. 2000); Peterson v. Davis, 551 F. Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984).  Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims."  White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).  "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted).  Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation.  Estelle, 429 U.S. at 105-06; White, 897 F.3d at 110.

The Third Circuit has found deliberate indifference where a prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment for non-medical reasons; or (3) prevents a prisoner from receiving needed or recommended treatment.  See Rouse, 182 F.3d at 197.  The court also has held that needless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, violates the Eighth Amendment.  Atkinson, 316 F.3d at 266.  See also Monmouth County Correctional Institutional Inmates, 834 F.2d at 346 ("deliberate indifference is demonstrated '[w]hen ...

23

prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment"); Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993); White v. Napoleon, 897 F.2d 103 (3d Cir. 1990).

This Court considers the first prong of the Estelle test, namely, whether plaintiff has stated a serious medical need. Transsexualism is a condition that exists when a physiologically normal person is extremely uncomfortable and discontent with his or her particular sex and prefers to be another sex.  See  Farmer v. Hawk-Sawyer, 69 F. Supp.2d 120, 121, n.1 (D.D.C.,1999)(citing Diagnostic and Statistical Manual of Mental Disorders, 532-33 (4th Ed.1994)).  Transsexuals generally wish to use hormonal, surgical and civil court procedures to allow them to live in their preferred sex/gender role.  They are distinguished from transvestites, who are male heterosexuals that cross-dress for sexual arousal rather than sexual comfort, and homosexuals, who are sexually attracted to persons of the same sex.  See Webster's Third New International Dictionary, 1085 (1993).  See also Houston v. Trella, 2006 WL 2772748 (D.N.J. Sept. 26, 2006). Courts have consistently considered transsexualism or transgenderism a serious medical need for purposes of the Eighth Amendment.  See Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000); White v. Farrier, 849 F.2d 322, 325 (8th Cir. 1988); Meriwether v. Faulkner, 821 F.2d 408, 411-13 (7th Cir.), cert.

<u>denied</u>, 484 U.S. 935 (1987); <u>Wolfe v. Horn</u>, 130 F. Supp.2d 648, 652 (E.D. Pa. 2001).

In this case, Smith simply alleges that he suffers from GID. He points to no medical or psychiatric/psychological diagnosis. In fact, the NJDOC psychiatrist, Dr. Baum, stated in a report that plaintiff does not meet the two major criteria for a diagnosis of GID. Smith complains that he has been unable to obtain a second opinion diagnosis. Therefore, Smith has not demonstrated that he suffers from a serious medical need, although he does place this issue of fact in dispute.

The Court also must consider whether plaintiff has alleged deliberate indifference on the part of defendants. Smith admits that he has received counseling and medication, but not the treatment and therapy he wants with respect to GID. Smith's allegations do not demonstrate deliberate indifference by defendants, but rather, plaintiff's disagreement with their medical/psychological diagnosis and treatment. As stated above, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. <u>Andrews</u>, 95 F. Supp.2d at 228; <u>Peterson</u>, 551 F. Supp. at 145.

Moreover, it is clear that Smith was not undergoing hormone therapy or other type of treatment for GID that was disrupted by defendants. It is not deliberate indifference to deny treatment for GID if there was no prior therapy as in this instance. For example, courts have rejected demands for hormone therapy by

25

transgender inmates who were not prescribed hormones by a private endocrinologist outside the prison setting.  Wolfe, 130 F. Supp.2d at 652 (citations omitted).  However, the case is different when prison officials terminate hormone therapy that was previously recommended and administered by medical professionals.  See Phillips v. Michigan Dep't of Corrections, 731 F. Supp. 792, 800-01 (W.D. Mich. 1990), aff'd, 932 F.2d 969 (6th Cir. 1991)(it would constitute deliberate indifference for prison officials to take measures that actually reverse the effect of years of healing medical treatment); see also South v. Gomez, 211 F.3d 1275, 2000 WL 222611 (9th Cir. 2000); Saunders v. Horn, 959 F. Supp. 689, 694 (E.D. Pa. 1997), adopted 960 F. Supp. 893 (E.D. Pa. 1997).

    In fact, in this case, Smith has been evaluated by psychiatrists, psychologists and social workers at the NJDOC. There has been no recommendation for hormone treatment or surgery, nor has there been any confirming diagnosis of GID. Smith does not allege that he came into the prison system having started hormone therapy or other treatment for GID.  Indeed, he does not indicate any previous medical/psychological diagnosis of GID.  Smith admits that defendants have offered counseling and alternative treatments to address his transgender concerns, which he has refused for alleged privacy concerns, although he also admits that the doctors and counselors made efforts to ensure private sessions within the confines of his unit.  Smith further

admits that defendants have suggested medications to reduce his alleged desires to be female, which Smith also has declined.

Accordingly, under these facts as alleged by plaintiff, the Complaint fails to show either a serious medical need or deliberate indifference sufficient to support an Eighth Amendment denial of medical care claim.  See Lopez v. City of New York, 2009 WL 229956 *11 (S.D.N.Y. Jan. 30, 2009).  Such claim must be dismissed at this time for failure to state a cognizable claim, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(2).

D.  Equal Protection Claim

Next, Smith asserts in Count Two of his Complaint that he is being subjected to conditions which are grossly disparate when compared to other women who are incarcerated.  Namely, he states that defendants have refused to provide him with necessary articles of women's clothing and amenities.

In order for a plaintiff to state an equal protection claim, a plaintiff must allege: (1) he is a member of a protected class; and (2) that he was treated differently from similarly situated inmates.  Saunders v. Horn, 959 F. Supp. 689, 696 (E.D. Pa. 1996); see also City of Cleburne, Texas v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)(noting that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"); Price v. Cohen, 715 F.2d 87, 91 (3d Cir. 1983)("To establish a violation of the Equal Protection Clause, a plaintiff must show that [an] allegedly offensive

categorization invidiously discriminates against [a] disfavored group."), <u>cert</u>. <u>denied</u>, 465 U.S. 1032 (1984); <u>Oliveira v. Township of Irvington</u>, 41 Fed. Appx. 555, 559 (3d Cir. 2002). Plaintiff may satisfy the second element by naming similarly situated members of an unprotected class who were [treated differently] or, in some cases, by submitting statistical evidence of bias.  <u>Bradley v. United States</u>, 299 F.3d 197, 206 (3d Cir. 2002)(citations omitted).

Here, Smith alleges only that he has not been provided women's clothing and amenities like other women who are imprisoned, even though he is confined with other men.  These conclusory allegations do not state an equal protection claim. <u>See</u> <u>Brown v. Zavaras</u>, 63 F.3d 967, 970-72 (10th Cir. 1995)(even assuming other prisoners received female hormones, plaintiff's equal protection allegations were conclusory and did not state factual basis).

Moreover, "[t]here is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence."  <u>Jones v. North Carolina Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 136 (1977).  In this instance, defendants' actions in denying Smith women's clothing were "reasonably related to legitimate penological interests." <u>Turner v Safley</u>, 482 U.S. 78, 89 (1987).  Smith is housed with men and his desire to dress as a woman in the midst of other men

could pose a security risk to plaintiff's safety and the safety of others at the prison. "[P]rison authorities must have the discretion to decide what clothing will be tolerated in a male prison and the * * * denial of female clothing and cosmetics is [not] a constitutional violation." Lamb v Maschner, 633 F. Supp. 351, 353 (D. Kan. 1986). Here, it is clear that defendants did not disadvantage Smith, by denying him women's clothing while he is confined with other men in prison, for reasons lacking any rational relationship to a legitimate penological concern for plaintiff's safety and for the safety and security of the institution.

Therefore, Smith fails to state an equal protection claim against the defendants, and the claim will be dismissed accordingly, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and §1915A(b)(1).

E.   Right to Privacy Claim

Finally, in Count Three, Smith argues that defendants have violated his right to privacy. Principally, Smith argues that defendants refused to provide him with private and confidential meetings with members of the Mental Health Department in order for Smith to fully discuss his GID. Smith claims that this action violates his Ninth Amendment right to privacy as well as New Jersey state law, N.J.S.A. 10A:16-4.4, by forcing him to discuss his GID in plain view and hearing of other staff and inmates, by disclosing Smith's GID to others in violation of

29

state law and regulation, which led housing unit officers and other officers throughout the prison facility being notified about Smith's GID issues.  Smith also states that defendants have continued to violate his right to private and confidential meetings by having him placed in a double-lock cell where he is required to talk with members of the mental health department through the gated cell door, or not at all.

The Ninth Amendment states that "[t]he enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people."  This amendment does not independently create a constitutional right for purposes of stating a claim.  Schowengerdt v. United States, 944 F.2d 483, 490 (9th Cir. 1991).  "The Ninth Amendment is *not* a source of rights as such; it is simply a rule about how to read the Constitution."  Reno, 98 F.3d at 1125, quoting Laurence H. Tribe, American Constitutional Law 776 n. 14 (2d ed. 1988) (emphasis in original).  See Porter v. City of Davis Police Dept., 2007 WL 4463344, * (E.D.Cal.  Dec. 17, 2007).

The closest that Smith comes to stating such a Ninth Amendment claim, as he asserts in his Complaint, is when he alleges that his "confidentiality is being violated."  Granted, the Ninth Amendment may, in some circumstances, protect the disclosure of some personal information about a prisoner (e.g., regarding the prisoner's mental health).  For instance, the Supreme Court of the United States has recognized that there

exists in the United States Constitution a right to privacy protecting "the individual interest in avoiding the disclosure of personal matters." Whalen v. Roe, 429 U.S. 589, 599 (1977).  See also Doe v. Delie, 257 F.3d 309, 315 (3d Cir. 2001); Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994).  Thus, while prisoners are divested of many significant constitutional rights as a result of their status, their limited right of privacy has been extended to cover medical information regarding inmates. See Doe v. Delie, 257 F.3d at 317; Powell v. Shriver, 175 F.3d 107, 112-13 (2d Cir. 1999).  This narrow constitutional right applies in the case of an unusual medical condition which, if disclosed unnecessarily, would likely expose the inmate to ridicule, discrimination, or even potential violence and harm, particularly when word of the condition is likely to spread through "humor or gossip[ .]"  Powell, 175 F.3d at 112. Transsexualism or transgender disorder, such as Smith's alleged condition here, has been found to be a sufficient condition to trigger this qualified right of privacy.  See Powell, 175 F.3d at 112-13.

However, the United States Court of Appeals for the Third Circuit recognized in Doe v. Delie that this limited constitutional right to privacy "is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security." Doe v. Delie, 257 F.3d at 317.  Any

policy or regulation that curtails such right must be "reasonably related to legitimate penological interests," as set forth in Turner v. Safley, 482 U.S. 78, 89 (1987).

In Powell, the court noted that it was not difficult to imagine the circumstances under which disclosure of an inmate's HIV-positive status would further legitimate penological interests, such as prevention of contagion.  However, the court found it harder to think of circumstances in which disclosure of an inmate's transgender condition, which is not contagious, would serve a legitimate penological purpose.  Given the sexually-charged atmosphere of most prisons, such disclosure might lead to inmate-on-inmate violence.  Powell, 175 F.3d at 112-13.

Here, Smith alleges a claim very similar to that as alleged in Hunnicutt v.. Armstrong, 152 F. App'x 34 (2d Cir. 2005)(unpublished decision), vacating in part, 305 F. Supp.2d 175, 187-188 (D. Conn. 2004).  In Hunnicutt, the United States Court of Appeals for the Second Circuit held that Hunnicutt adequately alleged federal constitutional and state law right to privacy claims, based on his allegations that defendants violated privileged communications by discussing plaintiff's mental health issues on the tier in the presence of other inmates, and allowing non-health staff access to plaintiff's confidential health information.  Hunnicutt, 152 F. App'x at 35.  In this case, Smith alleges that defendants violated his constitutional and state law right to privacy by conducting mental health sessions through

cell doors, and in the presence or earshot of other staff and inmates.  Further, he alleges that information with regard to his GID condition was disclosed to non-health staff in violation of his right to privacy.

Therefore, this Court finds that Smith's allegations, if true, are sufficient at this time to withstand preliminary screening, and the Court is constrained to allow this claim to proceed accordingly.

F.   Temporary Restraining Order

Finally, Smith seeks a temporary restraining order or preliminary injunctive relief to be removed from double-lock status and returned to single-lock and kept in a single-man cell. The traditional criteria for granting injunctive relief are: (1) whether the movant can show a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denying the injunction; (3) whether granting the requested injunctive relief will cause greater harm to the nonmoving party; and (4) whether granting the injunction is in the public interest. Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004); Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 252 (3d Cir. 2002).  Moreover, a plaintiff must establish more than a risk of irreparable injury.  He must demonstrate "'a clear showing of immediate irreparable injury.'" Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 205 (3d Cir.

33

1990)(quoting <u>ECRI v. McGraw-Hill, Inc.</u>, 809 F.2d 223, 225 (3d Cir. 1987))(emphasis added)).

Here, this Court finds that plaintiff has not demonstrated any of the four factors set forth above, necessary to grant preliminary injunctive relief.  Most importantly, however, Smith has not shown the first two criteria, success on the merits and irreparable harm.

First, Smith has not shown that he is likely to succeed on the merits of his claims.  While he has pleaded the necessary facts to support a claim of retaliation and possibly, a failure to protect and right to privacy claim, this Court finds that he has failed to state a claim with respect to an Eighth Amendment denial of medical care concerning his GID condition or an equal protection claim.  The Court also points out that while there are several claims proceeding at this preliminary juncture, defendants have not had the opportunity to respond to any of plaintiff's allegations, or to show that their actions with respect to plaintiff might have been prompted by legitimate penological concerns.  Significantly, Smith has not shown that he actually has GID, which is the crux of his case, and medical and psychiatric diagnoses to date have found no basis for a GID diagnosis.

Second, Smith also has not demonstrated irreparable harm. There simply has been no medical/psychological diagnosis of GID. There also have been no allegations of harm or threats of

34

violence against plaintiff from other inmates or staff.
Consequently, there does not appear to be any immediate threat to
plaintiff's safety.

Finally, there is a greater public interest in the orderly
administration and security of prisons to which federal courts
defer to prison officials and administrators.  Therefore, this
Court will deny plaintiff's motion for injunctive relief at this
time.

V.  <u>CONCLUSION</u>

For the reasons set forth above, plaintiff's Eighth
Amendment claims alleging denial of medical/psychological care
and deliberate indifference to plaintiff's medical/psychological
needs will be dismissed, without prejudice, for failure to state
a claim at this time.  Plaintiff's claim alleging that he has
been denied equal protection will be dismissed with prejudice,
for failure to state a claim, pursuant to 28 U.S.C. §§
1915(e)(2)(B)(ii) and 1915A(b)(1).  However, plaintiff's claims
alleging retaliation, failure to protect, and a violation of his
right to privacy, will be allowed to proceed at this time.
Finally, plaintiff's application for preliminary injunctive
relief is denied without prejudice.  An appropriate order
follows.

<u>s/Freda L. Wolfson</u>
FREDA L. WOLFSON
United States District Judge

Dated: February 19, 2010

35