NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JAMES R. SMITH,                     :
                                    :   Civil Action No. 09-2602 (PGS)
            Plaintiff,              :
                                    :
                                    :
            v.                      :   **OPINION**
                                    :
GEORGE W. HAYMAN, et al.,           :
                                    :
            Defendants.             :

**APPEARANCES:**

        JAMES R. SMITH, Plaintiff pro se
        423443
        New Jersey State Prison
        P.O. Box 861
        Trenton, New Jersey, 08625-0861

        CRAIG J. SMITH, ESQ.
        MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
        1617 John F. Kennedy Blvd., Suite 1500
        6981 North Park Drive
        Philadelphia, PA 19103-1815
        Counsel for Defendants, Dr. Flora DeFilippo, Dr. Marina
            Moshkovich, and Ms. Keasha Baldwin

        EMILY ANNE SAMUELS, ESQ.
        OFFICE OF THE N.J. ATTORNEY GENERAL
        DIVISION OF LAW
        R.J. Hughes Justice Complex
        25 Market Street, P.O. Box 112
        Trenton, New Jersey 08625
        Counsel for Michelle Ricci

**SHERIDAN,** District Judge

THIS MATTER comes before the Court on the motions of
defendants, Dr. Flora DeFilippo,[1] Dr. Marina Moshkovich, and Ms.
Keasha Baldwin (Docket entry no. 83) and Administrator Michelle
Ricci (Docket entry no. 85) for summary judgment pursuant to
Fed.R.Civ.P. 56.  Plaintiff filed oppositions to defendants'
motions.  (Docket entry nos. 86 and 87).  Defendants filed reply
briefs, respectively.  (Docket entry nos. 88 and 90).  This
matter is being considered on the papers pursuant to Fed.R.Civ.P.
78.  For the reasons set forth below, defendants' motions will be
granted.

I.   BACKGROUND

A.   Procedural History

On or about May 29, 2009, plaintiff, James R. Smith
("Smith"), filed a civil rights Complaint, pursuant to 42 U.S.C.
§ 1983, against numerous defendants: George W. Hayman, Commission
of the New Jersey Department of Corrections ("NJDOC"); Michelle
Ricci, Administrator of the New Jersey State Prison ("NJSP"); Dr.
Rusty Reeves; Dr. Jordan Lieberman; Dr. Flora DeFilippo; Dr. Ray

---

[1]   At the time defendants submitted their motion for summary
judgment, this Court had not yet ruled on Dr. DeFilippo's then-
pending motion for judgment on the pleadings.  (Docket entry no.
68).  On January 19, 2012, this Court issued an Opinion and Order
(Docket entry nos. 92 and 93) granting Dr. DeFilippo's motion and
ordered that this action be dismissed with prejudice, in its
entirety, as to Dr. DeFilippo.  Consequently, because Dr.
DeFilippo has been terminated as a defendant in this action,
defendants' present motion for summary judgment will be
considered as on behalf of Dr. Moshkovich and Ms. Baldwin.

Baum; Dr. Marina Moshkovich; Ms. Keasha Baldwin, Clinical Social Worker; and John/Jane Doe defendants #1-20.   (Complaint, Caption, ¶¶ 15-23).  The Complaint asserted claims of retaliation, failure to protect, infringement of his right to privacy, denial of medical care and treatment, and denial of equal protection.  In an Opinion and Order entered on February 19, 2010, the Honorable Freda L. Wolfson, U.S.D.J., dismissed plaintiff's claims asserting denial of medical care and equal protection, but allowed the remaining three claims to proceed. (Docket entry nos. 4 and 5).  On June 30, 2010, defendant Hayman was dismissed from this action.  (Docket entry no. 28).  By letter Order entered on February 17, 2011, defendants Reeves, Lieberman and Baum were voluntarily dismissed from this action. (Docket entry no. 61).  On January 19, 2012, this Court issued an Opinion and Order granting the motion for judgment on the pleadings, filed by defendant Dr. DeFilippo, and dismissed with prejudice the Complaint as to Dr. DeFilippo.  The remaining defendants are Administrator Ricci, Dr. Moshkovich and Keasha Baldwin.

       In his Complaint, Smith alleged that he suffers from a Gender-Identity Disorder ("GID").  He claimed that he is a male-to-female transgender individual, born biologically male but allegedly psychologically and emotionally female.  In dismissing the denial of medical care claim, Judge Wolfson found that Smith

3

failed to cite an actual medical or psychiatric/psychological diagnosis. In fact, the prison psychiatrist, defendant Dr. Baum, stated in a report that Smith did not meet the two major criteria for a diagnosis of GID. Smith had been evaluated by psychiatrists, psychologists and social workers at the New Jersey Department of Corrections ("NJDOC"). There was no recommendation for hormone treatment or surgery, nor was there any confirming diagnosis of GID. Further, Smith was not undergoing hormone therapy or other type of treatment for GID that was disrupted by defendants. He did not arrive in the prison system having started hormone therapy or other treatment for GID. Indeed, he failed to cite any previous medical/psychological diagnosis of GID. Smith also admitted that defendants offered counseling and alternative treatments to address his transgender concerns, which he has refused for alleged privacy concerns, although he also admitted that the doctors and counselors made efforts to ensure private sessions within the confines of his unit. Smith further admitted that defendants have suggested medications to reduce his alleged desires to be female, which Smith also has declined. Accordingly, Judge Wolfson dismissed the denial of medical care claim because there was no demonstrated deliberate indifference to deny treatment for GID where no prior therapy was alleged, citing Wolfe v. Horn, 130 F. Supp.2d 648, 652 (E.D. Pa. 2001).

Shortly thereafter, Smith filed a motion for a preliminary injunction to enjoin defendants, Dr. Moshkovich and others from deleting medical health diagnoses from his electronic medical record ("EMR") and to have the Court impose sanctions against defendant for deleting a medical diagnosis from his EMR in violation of law. (Docket entry no. 35). In particular, Smith attached a March 4, 2010 EMR and a July 29, 2010 EMR, noting that several entries on the March EMR were not included on the July EMR, namely, hx (history) of post traumatic stress disorder; major depressive disorder, recur, full remis; hx of polysubstance dependence; dysthymic disorder; paraphilia (arousal to forcible sex); and "? of gender identity disorder." (Id., Motion at Exhibit 3).

In an Opinion and Order filed on February 23, 2011, Judge Wolfson denied Smith's motion for a preliminary injunction because it failed to satisfy the first two factors necessary for issuance of preliminary injunctive relief. (Docket entry nos. 62 and 63). Namely, the Court found that Smith could not demonstrate a likelihood of success on the merits. In particular, the Court found no actual deletions of a reference to GID because no diagnosis of GID has ever been made with respect to Smith. Moreover, the "deletions" alleged by Smith were not actual deletions of medical information from Smith's medical records. Rather, the March 2010 EMR references current problems

existing at that time that were not existing current problems in July 2010.  Further, none of those current problems in the March 2010 pertained to any diagnosis.  Thus, the Court concluded that Smith had little to no likelihood of success on this claim, as he could not show any merit to his accusation that information in his medical records were deleted or destroyed, or that the information concerning his "current problems" in March 2010 are unavailable for purposes of obtaining evidence pertinent to his pending case.  Indeed, both EMRs, made part of the record by Smith, plainly demonstrated that diagnosis information in Smith's medical records had not been deleted.  Finally, the Court noted that there was no evidence to show that defendants, in particular, Dr. Moshkovich, did anything in violation of the law or of plaintiff's constitutional rights that would warrant injunctive relief.  Namely, Smith provided no evidence of any kind that information in his medical records were deleted by Dr. Moshkovich or others.  (February 23, 2011 Opinion, Docket entry no. 62 at pp. 5-6).

The Court also found that Smith failed to support a claim of irreparable harm based on the fact that there was no indication that Smith's medical records had been compromised in any way by defendants or that the medical records needed to prove his case were no longer available.  The Court observed that Smith had undermined his own argument by producing medical records which

clearly showed that no medical diagnoses have been deleted, as alleged.  Instead, the EMRs simply referenced the list of current problems existing in March 2010 that were not existing as current problems in July 2010.  Thus, the Court concluded that there was no indication that Smith's future treatment would be imperiled because no diagnoses have been deleted from Smith's medical records.  (Id. at pp. 6-7).

On August 11, 2011 and September 9, 2011, the remaining defendants filed their respective motions for summary judgment. (Docket entry nos. 83 and 85).  In their motion, defendants Moshkovich and Baldwin, argue that they are entitled to summary judgment because (1) Smith failed to exhaust his administrative remedies as required by statute; (2) defendants are entitled to qualified immunity; (3) the claims raised by plaintiff have been previously litigated  in state court and are thus barred under the doctrine of issue preclusion; and (4) plaintiff waived his privacy claim when he publicized his GID claims through multiple legal proceedings that were covered by television and newspapers.

In defendant Ricci's motion, she contends that summary judgment should be granted because (1) Smith failed to exhaust his administrative remedies with respect to his privacy claim; (2) the doctrine of issue preclusion bars these claims which have been previously litigated in state court; (3) plaintiff has only a limited right to privacy in prison; (4) plaintiff's retaliation

claim fails to show that he was engaged in a constitutionally-protected activity and that he was not subject to an adverse action; (5) all claims against defendant in her official capacity are barred by the Eleventh Amendment; and (6) defendant is entitled to qualified immunity on plaintiff's claims against her in her individual capacity.

Plaintiff filed opposition to defendants' motions. (Docket entry nos. 86 and 87). Defendants filed reply briefs shortly thereafter. (Docket entry nos. 88 and 90).

B.   <u>Statement of Facts</u>

The following material facts are taken from the defendants' Statement of Material Facts in Support of Motion for Summary Judgment, submitted pursuant to Local Civil Rule 56.1. (Docket entry nos. 83-1 and 85-3).

Smith has been confined at NJSP since October 3, 2001, as a result of his conviction on two counts of first degree kidnapping, four counts of aggravated sexual assault and numerous other offenses. He is sentenced to serve 105 years in prison, with an 85½-year parole disqualifier pursuant to the No Early Release Act. (September 8, 2004 Judgment of Conviction, attached as Exhibit B to Affidavit of Craig J. Smith). In imposing such a lengthy sentence, the Honorable Carmen H. Alvarez, J.S.C. found that Smith was a compulsive and repetitive offender, having an extensive juvenile record for sexual offenses, and further stated

that "defendant is not in control of any of his impulses.  He is
a highly dangerous sexual predator, most likely a sociopath who
feels no genuine remorse for the damaged human lives he leaves
behind."  (Id.).

In affirming Smith's conviction and sentence, the Superior
Court of New Jersey, Appellate Division recited the facts of the
case as follows:

> On August 5, 2002, [redacted] and her friend, [redacted],
> both age seventeen, went to Ocean City, New Jersey with
> [redacted]'s family.  On August 7, around 12:30 a.m.,
> [redacted] and [redacted] took a walk on the boardwalk,
> where defendant approached them from behind and told them he
> had a knife.  Defendant grabbed their collars and impelled
> them to an isolated area on the beach.
>
> Displaying a four to six inch serrated blade with a mahogany
> handle, defendant led the teenagers to a "no swimming" sign
> located near the water; a stone jetty was located on one
> side and a wooden pier on the other. [redacted] testified
> that she and [redacted] believed defendant would hurt them
> if they did not do what they were told, "because of the
> knife."  Defendant ordered [redacted] to remove his shirt.
> Defendant cut it with a pocket knife he had in his
> possession, and used pieces of the shirt to tie [redacted]'s
> hands to the sign.  Defendant instructed [redacted] to
> remove [redacted]'s shorts; defendant cut the shorts and
> used them to gag [redacted] and tie his feet to the sign.
> Defendant "told [redacted] to put [her] hand down
> [redacted]'s shorts and touch his penis and testicles and to
> perform oral sex on him." [redacted] complied.
>
> Later, leaving [redacted] tied to the sign, defendant, while
> holding [redacted]'s wrist in one hand and a knife in the
> other, walked [redacted] back to the boardwalk, and then to
> defendant's car.  Before they left the beach, defendant told
> [redacted] that "if he got out and told police, that either
> he or one of his friends would come and find him and kill
> him."  Undeterred, [redacted] got loose, returned to the
> motel where his family was staying, and called the police.
> [redacted] provided a description of the suspect to police,

describing him as a "[h]ispanic male, roughly five nine, five ten, medium build, darkish-colored hair, dark eyes."

Defendant drove [redacted] from Ocean City to a secluded wooded area in Cape May County. [redacted] estimated that she was in the car twenty minutes to half an hour before defendant stopped in an alcove on a dirt road. For the next hour and a half to two hours, defendant performed oral sex on [redacted] and raped her anally and vaginally.

When he finished, defendant drove her further down the dirt road to another, smaller alcove, located in Cumberland County, where he again raped her. Afterward, he had her kneel behind the car. He put a towel around her neck and pulled up on the towel from behind, twisting the two ends together. Defendant told [redacted] that he had to kill her because otherwise he would get caught by the police. After [redacted] told defendant that if he let her go she would not implicate defendant to the police, he cut the towel into pieces and used it to gag [redacted] and tie her to a tree. Before he left her in the woods in that condition, defendant told [redacted] he would call the police and let them know where to find her body.

After defendant drove away, [redacted] untied herself and walked back to the road, which took her an hour and a half. At approximately 9:00 a.m., a passing motorist gave her a ride. She appeared "disheveled," and had a look of "desperation."

The driver flagged down a Delaware River and Bay Authority (DRBA) police vehicle, driven by DRBA Patrolman Kenneth Sheeky, who testified that when he saw [redacted], she had "puffy eyes," was crying and shaking, had redness around the base of her neck, and was clutching pieces of blue and whit cloth. Sheeky drove [redacted] to the state police barracks in Port Norris, where [redacted] described the person who abducted and raped her as "five foot eleven, about 190 pounds, 23-years old, brown hair, brown eyes, large round glasses and a mustache." [redacted] also supplied a description of and the license plate number of defendant's car.

[redacted] told Lynn Rybicki, a nurse at the hospital where [redacted] was taken by the police, that the suspect had raped her anally and vaginally. On examination, Rybicki observed swelling in [redacted] vaginal and anus areas. Defendant's semen was found in [redacted].

Detective David Fletcher from the Ocean City Police
Department investigated the crimes.  A license plate search
matched the plate number provided by [redacted] with a car
registered to defendant at a Vineland address.  On August 9,
Fletcher, along with two investigators, went to that
address, where Fletcher observed a car in the driveway that
fit the description [redacted] gave of the suspect's car;
its license plate contained the number [redacted] had
provided.  After a search warrant was obtained, two knives
were found in the residence.  Subsequently, [redacted] and
[redacted] each identified defendant out of a photographic
line-up.

. . .

On January , 2002,[2] while defendant was incarcerated,
[redacted]'s father received a letter in the mail addressed
to his daughter, although their address was unlisted.  It
contained a pornographic picture.  It read:

> Hey, bitch.  It took me awhile.  But I and my lovely
> companions have tracked you down and have your address.
> See, you can run, but you can't hide from the
> gingerbread man.  No matter where you go in this world,
> I will track you down and as of right now, your every
> move is being carefully watched.  So is [redacted].
> And as soon as you take that fateful step, bang, you're
> fucking dead.  Remember, I have friends in the lowest
> and highest of places that is [sic] willing to kill for
> me because of the pain you caused me.  You're nothing
> but a little slut.  You wanted to get fucked, then you
> ran like a little bitch.  I should have killed you
> myself when I started, but I figure I let you ... live.
> Big mistake.  If I knew you got loose, I would have run
> over you with my car, over and over and over until you
> were unrecognizable.  Remember, don't ever fuck with a
> truck driver or his friends.  Yes, I'm out to kill you
> and you will be killed.  I won't rest until you're
> dead.  Then will I be completely happy with what I did
> to you.  Even if you go on the witness protection
> program, that won't help you.  I have the means and the
> friends necessary to find you.  Nothing will stop me or

---

[2]  In 2001, Smith had been convicted and sentenced in
accordance with the guilty plea for the above-mentioned offenses.
He was sentenced to forty years in prison with a 3-year period of
parole ineligibility.

get in my way of killing you.  As long as I'm a live,
you won't and you won't be alive too much longer,
bitch.  Here's a picture of us.  You'll love it, slut.
Love, The Killer, The Gingerbread Man.

After [redacted] read the letter, her father turned it over
to the prosecutor's office.  After comparing the letter to
handwriting samples from defendant, a forensic document
examiner opined that the letter was written by defendant.

Based upon the letter, defendant was again indicted in Cape
May County, on February 26, 2002, charged with one count of
third-degree terroristic threats ... .Subsequently, the
prosecutor successfully moved to vacate defendant's previous
plea agreement and sentence, and have the two indictments
consolidated. ...

(October 5, 2004 Appellate Division Opinion, Ex. C to Smith

Decl.).

Plaintiff Smith admitted that when he was interviewed at the

Adult Diagnostic and Treatment Center for sentencing purposes, he

told a psychologist that he had thrown a teacher out of a second

story window.  (April 8, 2011 Deposition of Plaintiff ("Smith

Dep.") 31:21-32:22, Ex. A).  Smith also admitted telling the

psychologist that he does not like talking to women about his

problems.  (Smith Dep., 32:5-10, Ex. A).

Defendants Dr. Moshkovich and Social Worker Baldwin are

women employed by the University of Medicine and Dentistry of New

Jersey ("UMDNJ") to provide treatment to inmates at the NJSP

pursuant to a contract between UMDNJ and the NJDOC.  Dr.

Moshkovich is a psychiatrist who met with Smith periodically to

provide mental health treatment services from December 2007 to

August 6, 2009.  She has not provided any treatment or other

12

mental health services to Smith since August 6, 2009. (Declaration of Marina Moshkovich, M.D. at Ex. E).

Ms. Baldwin was assigned to provide social work services to Smith beginning in December 2007 to January 2009, at which time she was reassigned and no longer was involved with treatment of or social work services to Smith.  In fact, Ms. Baldwin no longer works at NJSP and is not employed by UMDNJ at this time. (Declaration of Keasha Baldwin, Ex. F).

While providing mental health treatment and social work services to the inmates at NJSP, neither Dr. Moshkovich or Ms. Baldwin had any control over the physical facilities provided by the NJDOC for meeting with inmates and they were subject to the safety and security directions by NJDOC custody personnel, over whom they had no control.  (Moshkovich Decl., Ex. E and Baldwin Decl., Ex. F).  Since Smith filed this action, he has not been treated by either Dr. Moshkovich or Ms. Baldwin, and there is no prospect that they will treat him in the future. (Smith Dep. 47:17-25, Ex. A).

The contract between UMDNJ and NJDOC for the provision of health and social services was dated November 1, 2004, and became effective January 1, 2005.  It was a two year term contract, which was extended for another two-year term from its original December 31, 2006 expiration date to December 31, 2008.  It again was extended for 18 months through June 30, 2010.  (Dickert Declaration, Ex. G).  Of pertinence here, Section 3.1.12 of the

13

Agreement between UMDNJ and the NJDOC, titled "General

NJDOC/UMDNJ Support" provided:

> a.   NJDOC will provide UMDNJ with office space, facilities
>      as designated by NJDOC to perform its obligations and
>      duties under the Agreement...
> b.   NJDOC will provide the appropriate level of security as
>      determined by the Facility Administrator for all areas.

(Dickert Decl., Ex. G).

Smith testified at his deposition in this matter that he

understood when he signed his February 8, 2002 mental health

treatment plan prepared by Dr. Jeff Mandell, that there would be

a team involved in his mental health care, which would include

psychiatry, nursing, psychology and social work, and that at the

very least, a social worker, psychiatrist and psychologist would

read and sign his mental health treatment plans.  (Smith Dep.

11:1-10, Ex. A).  The only mental health meetings that Smith

alleges violated his privacy rights were meetings with Ms.

Baldwin and Dr. Moshkovich, both of whom are women.  (Smith Dep.,

41:15-22, Ex. A).

No interview room was available for Ms. Baldwin's use with

plaintiff in housing unit 3A.  Although an interview room existed

on housing unit 3A, Ms. Baldwin was not allowed by NJDOC

officials to use it with Smith for security and safety reasons

because the room's security devices were not operational.

(Baldwin Decl., Ex. F).  Further, as a female clinician, Ms.

Baldwin was not permitted by NJDOC custody officials to meet with

14

Smith alone behind a closed door without a security cage, nor
would Ms. Baldwin have felt safe doing so. (<u>Id</u>.).

Ms. Baldwin addressed the lack of a safe interview room with
her supervisor, Dr. DeFilippo, who asked the NJDOC to remedy the
situation. No functional, safe interview was ever made available
for Ms. Baldwin's use with Smith. Consequently, she met
individually with each inmate for whom she provided social
services on housing unit 3 at a table, alone, outside the cells,
which had solid steel doors with non-opening glass windows. The
conversations at these interviews were conducted quietly and were
paused if anyone passed within earshot. A corrections officer
was visible and available to provide security and prompt response
if necessary. In this way, both the inmate's privacy concern and
the facility's security concerns were protected. (<u>Id</u>.).

Smith testified that Ms. Baldwin never conducted any
interviews with him through his cell door and that they always
met at the table outside the cells on housing unit 3A. (Smith
Dep. 49:20-23, Ex. A). He first met with Ms. Baldwin at that
location on December 13, 2007. Smith confirms that it was he
who voluntarily raised the subject of GID for the first time.
(Smith Dep. 48:18-49:10, Ex. A).

Smith never asked Ms. Baldwin to meet with him at another
location; nor did he advise her that he would not meet with her
for privacy reasons. Smith also did not ever tell Ms. Baldwin
that he refused to discuss his GID concerns at that location for

15

privacy reasons.  (Baldwin Decl., Ex. F).  Smith testified that
he continued to meet with Ms. Baldwin approximately once every
two weeks thereafter at the same location.  (Smith Dep. 49:11-15,
Ex. A).

Ms. Baldwin states that she never discussed or disseminated
Smith's mental health information in public or with any person
outside of Smith's mental health treatment team.  (Baldwin Decl.,
Ex. F).

On January 4, 2008, Smith wrote a letter to Dr. DeFilippo,
which referred to his December 2007 meeting with Ms. Baldwin.
The letter discussed Smith's GID issues and made requests for
treatment, women's clothing and amenities, but it did not raise
any privacy concerns.  (Smith Dep. 18:15-20; 50:12-51:9; 19:2-6,
Ex. A).  The January 4, 2008 letter was attached with Smith's
February 13, 2008 Inmate Remedy System Form, bate stamped DOC
111-116 and attached as Ex. H.  (Smith Dep. 18:15-20, Ex. A).

Dr. Moshkovich first met with Smith on December 17, 2007, to
discuss the GID issues Smith previously had raised with Ms.
Baldwin.  The meeting was conducted at the table outside Smith's
cell on housing unit 3A, the same location as used for his
meeting with Ms. Baldwin.  No functional, safe interview room was
made available for Dr. Moshkovich's use with Smith in housing
unit 3A, and Dr. Moshkovich would not meet with Smith in any
unsafe location.  (Moshkovich Decl., Ex. E).  The conversations
at these interviews were conducted quietly and were paused if

anyone passed within earshot.  A corrections officer was visible and available to provide security and prompt response if necessary.  Dr. Moshkovich asked the corrections officer to stay back from the table and make sure he could not hear the conversations.  (Id.).

At his deposition in this matter, Smith confirmed the conduct of the interviews with Dr. Moshkovich.  He testified that the doctors would give the housing unit officer a list of the inmates that were to be interviewed, and the unit officers would let the inmates out, one at a time, to meet with the doctors. (Smith Dep. 43:1-16), Ex. A).  Smith testified that when he came out of his cell to meet with Dr. Moshkovich, all of the other inmates in his housing unit were locked in their cells, except for inmate workers who were sweeping and mopping.  Smith personally told these inmates to move away to the end of the hall and the inmates complied.  (Smith Dep. 43:1-44:3; 44:13-24, Ex. A).  Smith admitted that when the corrections officer got close to the table, Dr. Moshkovich asked him first if he could hear, and when the officer responded no, Dr. Moshkovich still asked him to step away.  (Smith Dep. 44:13-18, Ex. A).  Smith agreed to sit at the table with Dr. Moshkovich, did not say to her that he did not want to meet there, nor did he refuse to proceed with the interview.  (Smith Dep. 44:25-46:4, Ex. A).

At the December 17, 2007 meeting with Dr. Moshkovich, Smith did not mention any GID issues with her, he did not raise any

privacy concerns , and he did not object to the location of the
meeting.  (Moshkovich Decl., Ex. E).  The next time they met, on
February 12, 2008, Smith again did not discuss any GID issues
that he had previously raised with Ms. Baldwin.  He also did not
complain about privacy concerns or the location of the meeting.
He was, however, rude and uncooperative.  (Id.).

Dr. Moshkovich attempted to speak with Smith again on March
12, 2008, but he was locked in his single occupancy cell due to a
prison lockdown, and she agreed she would not speak with him
through the cell door.  She arranged to have a meeting with Smith
at the table outside his cell on April 9, 2008.  The April 9,
2008 meeting was the first time Smith spoke to Dr. Moshkovich
about his claims of GID.  (Id.).

Smith never asked Dr. Moshkovich to meet with him at another
location than the table outside his cell on housing unit 3A.
There was no other safe location available to Moshkovich to meet
with Smith.  Further, Dr. Moshkovich is not aware of any legal
authority that requires her to meet with Smith out of sight and
immediate response of a corrections officer without a security
cage, nor would she agree to do so.  (Id.).

Smith testified that he has no recollection of asking either
Ms. Baldwin or Dr. Moshkovich to meet with him behind a closed
door at the D.B. School in NJSP.  (Smith Dep. 57:1-10, Ex. A).
He never filled out an Inmate Remedy System Form or a medical
request form asking to be seen by them in the D.B. School at

NJSP.  (Smith Dep. 23:9-18, Ex. A).  The D.B. School at NJSP did
not have any interview rooms equipped with security cages.  Dr.
DeFilippo stated that she would not have asked her female
clinicians to use an interview room at the D.B. School to
interview Smith outside the presence of a corrections officer,
for safety reasons.  She further stated that she was not aware of
any female clinician who used the D.B. School to conduct
interviews with Smith.  (DeFilippo Declaration, Ex. D).

Dr. DeFilippo sent NJSP administrators several memoranda
requesting that safe interview rooms be provided.  These
memoranda were dated July 10, 2008 and December 9, 2009,
addressed to Administrator Ricci; and February 17, 2010,
addressed to Assistant Superintendent Drumm.

Both Dr. Moshkovich and Ms. Baldwin state that they took
every reasonable precaution to preserve Smith's privacy under the
circumstances.  (Moshkovich Decl., Ex. E and Baldwin Decl., Ex.
F).  Dr. DeFilippo states that there was no policy or practice to
violate plaintiff's privacy rights.  (DeFilippo Decl., Ex. D).

The Complaint acknowledges that Smith has never been
diagnosed with GID.  An Office of the NJSP Administrator
Memorandum dated January 21, 2009 informed Smith that a NJSP
psychiatrist, Dr. Baum, had determined that Smith did not meet
the diagnostic criteria for GID.  (Complaint at ¶¶ 49-52).
Likewise, on February 4, 2009, Dr. Reeves and Dr. Lieberman
advised Smith that there was no record indicating that he had

GID.  (Compl., ¶¶ 57-58).  Dr. Moshkovich made an initial
notation on Smith's mental health record of a provisional
diagnosis of "sex identity disorder," which was added to his
Problem List as a question following her first discussion with
Smith about GID on April 9, 2008.  Dr. Moshkovich states that her
intention in noting this provisional diagnosis was to foster
discussion of the new issue with other members of Smith's mental
health treatment team.  (Moshkovich Decl., Ex. E).  After
evaluations of Smith by members of his mental health treatment
team, it was the consensus of the team that a diagnosis of GID
was ruled out.  (DeFilippo Decl., Ex. D; Moshkovich Decl., Ex. E;
and Baldwin Decl., Ex. F).

     Smith has testified in this matter that he knows about the
NJSP grievance procedure because he has been confined at NJSP for
more than ten years.  (Smith Dep. 67:12-20, Ex. A).  He admits to
have "some legal education in research and documents
preparation," and has held a prison job at NJSP as an Inmate
Paralegal.  (Defendants' Affidavit of Craig J. Smith at Ex. "I").

     In an Inmate Remedy System Form ("IRSF"), dated February 13,
2008, which attached Smith's January 4, 2008 letter addressed to
Dr. DeFilippo, Smith made a request for GID therapy in Part One
of the form.  (Smith Dep. 18:8-23, Ex. A; Document bate stamped
DOC 111-116, Ex. H).  The only complaint or issue raised in Part
One is a request for GID treatment; there is no reference to a
privacy problem.  (Id.).

Part Two of the IRSF contains no reference to a privacy issue.  (DOC 115, Ex. H).  Part Three of the IRSF under the heading "Staff Response Area" states: "IM has refused to discuss this with treating psychiatrist.  He must talk w/her - based on evaluation we will recommend an appropriate course of action." Part Three of the IRSF does not contain any reference to a privacy issue being raised by Smith.  (DOC 115, Ex. H).  Part Four of the IRSF is Smith's handwritten reply, or administrative appeal, to the Staff's response to his Part One request for GID treatment.  It is dated February 26, 2008.  The administrative appeal states: "I/M Smith is unable to speak to said psychiatrist due to lack of privacy and confidentiality, in part because 1) the unit officer sits nearby (at hearing distances); 2) the unit microphones being "on"; and 3) she wants the I/M Smith to discuss [her] issue out in the wide open of the unit.  Would like privacy and confidentiality to freely speak."  (Smith Dep. 22:6-22, Ex. A).  This was the first time Smith raised a privacy issue for administrative remedy.  (Smith Dep. 22:23-23:4, Ex. A).  There are no records of any other administrative remedy by Smith on the issue of privacy concerns, and Smith admits in his deposition that he has no recollection of any other IRSF prepared by him with regard to a privacy problem.  (Smith Dep. 23:5-8, Ex. A).

Smith admits that he never filed an IRSF regarding a claim of alleged retaliation by defendant Ricci.  (Smith Dep. 68:3-6, Ex. A).  Smith admits that he never filed an IRSF regarding a

claim that Ricci allegedly failed to protect him.  (Smith Dep. 68:14-20, Ex. A).  Smith admits that he never filed an IRSF complaining about his transfer from a "single lock" cell to a "double lock" cell.  (Smith Dep. 68:7-10, Ex. A).

On February 25, 2009, Smith filed an Appeal of Final Administrative Decision in the Superior Court of New Jersey, Appellate Division.  Smith raised the following issues in his appeal: "The Respondents has [sic] Failed to Provide the Appellant with Private and Confidential Meetings with Members of the Mental Health Department and Respondents Continues [sic] to Violate the Appellant's Rights to Privacy in Violation of the New Jersey Administrative Code 10A:16-4.4; N.J.S.A. 45:14B-28; Article I, Paragraphs 1 and 21 of the New Jersey Constitution; the Ninth[3] and Fourteenth Amendments of the United States Constitution and its State and Federal Precedents."  DOC APP DIV 1007-108, Ex. J).

The Appellate Division issued a decision and opinion on August 27, 2010, which reads in pertinent part:

> Appellant argues treatment for GID is necessary "to alleviate [the] discomfort of being trapped in a body that doesn't belong to [appellant]."  Yet, appellant has never been diagnosed with GID and there is no evidence in this record to support appellant's contention that he suffers from the mental health disorder.  Moreover, appellant resists the medical professionals' request to discuss these feelings and engage in therapy designed to consider whether he experiences the symptoms of GID, because of an overwhelming concern that someone might be listening.

---

[3]  It would appear that Smith intended to cite to the Eighth Amendment and not the Ninth Amendment.

First, an observation.  These contentions were not raised in the administrative proceedings from which the appeal is filed.  Generally, we reject considerations of matters not raised below, except those that present a question of constitutional dimension or public import that requires resolution without initial consideration by the trial judge.  Nieder v. Royal Indemn. Ins. Co., 62 N.J. 229, 234 (1973).  We will briefly address appellant's claims.

First, notwithstanding the lack of such a diagnosis, appellant claims his privacy was breached when Dr. Moshkovich discussed her evaluation with her supervisors, suggesting she revealed his male-to-female GID.  Appellant then leaps to the assumption these supervising physicians told the Housing Unit Officers, in violation of N.J.A.C. 10A:16-4.4 and with disregard of constitutional protections shielding disclosure of medical diagnoses.

Prison inmates do not shed all fundamental protections of the Constitution at the prison gates.  See Turner v. Safley, 482 U.S. 78, 95, 107 S.Ct. 2254, 2265, 96 L.Ed.2d 64, 83 (1987).  Rather, inmates "retain[] those [constitutional] rights that are not inconsistent with [their] status as [] prisoner[s] or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501 (1974).  With regard to an inmate's right to keep confidential previously undisclosed medical information, it follows that impingement on that right would be permitted only to the extent a prison official's actions were "reasonably related to legitimate penological interests." Ibid.

This record is devoid of facts supporting appellant's contentions that a gratuitous disclosure occurred.  Dr. Moshkovich acknowledged she discussed appellant's GID disclosure with her supervisors when discussing her evaluation and treatment.  Such discourse among the unit psychiatrists is necessary to devise an appropriate course of treatment for an inmate.  This record reflects several doctors were involved in appellant's mental health care.  These discussions can hardly be characterized as a breach of appellant's constitutional right to privacy.  Likewise, nothing shows the doctors then revealed the transgender identity issue to the Housing Unit Officers.  The claims are nothing more than mere speculation and supposition and are rejected.

Appellant next suggests breaches of his Eighth Amendment right to be free of cruel and unusual punishment occurred when the requests for provision of GID treatment, hormone

therapy, feminine clothing and related amenities were denied.  We completely reject the suggestion that because the mental health professionals were told by appellant of the experienced GID symptoms, the disorder is manifest.

The denial of GID treatment was based on psychological and psychiatric evaluations and appellant's prison record evincing appellant lacked female gender identification. Nothing in the pre-sentence report supports his contention he was living "as a woman."  His inmate photograph shows he has had a long-standing mustache.  Prior mental health therapy was for post-traumatic stress disorder and depression, not GID.

We reiterate that appellant, now age thirty-three, has never been diagnosed with GID.  The prison psychiatric staff has evaluated appellant on several occasions and concluded there is insufficient evidence to establish the criteria to support a GID diagnosis.  The DOC continues to provide mental health treatment and encouraged appellant to discuss feelings that will aid in future care.  Its failure to accept appellant's self-diagnosis is neither arbitrary nor capricious and is not of constitutional dimension.

Appellant's remaining arguments lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

(August 27, 2010 Appellate Division Opinion, Ex. K).

Smith filed a petition for certification with the New Jersey Supreme Court, presenting the following questions for review:

1.   Does Appellant Have A Constitutional Right To Privacy and Confidentiality When Discussing His Mental Health Needs With Members Of The Mental Health Department?
2.   Does The Appellant Have A Constitutional Right To Be Provided With Private And Confidential Meetings With Members Of The Mental Health Department Pursuant To The New Jersey State Prison Internal Management Procedures And Policies?

(Smith Dep. 30:3-24, Ex. A; Ex. L).

Smith argued that these issues were issues of first impression.  (Smith Dep. 31:4-8, Ex. A).  The New Jersey Supreme

Court denied certification on March 31, 2011.  (Smith Dep. 25:9-24, Ex. A).

On February 13, 2008, Smith filed an IRSF demanding GID treatment.  This IRSF contained a copy of Smith's January 4, 2008 letter to Dr. DeFilippo in which he disclosed to Dr. DeFilippo his claim to have GID.  The IRSF was received by the Inmate Remedy System Coordinator who was not part of Smith's mental health team; nor was anyone else in the NJSP Administrator's Office who saw Smith's February 13, 2008 IRSF.

On April 25, 2008, Smith filed his first appeal in the Appellate Division regarding his claim to have GID and his request for treatment.

On July 16, 2008, Smith filed an application in the Superior Court of New Jersey, Law Division, Mercer County, Docket No. MER-L-1830-08, seeking to change his name to "Amanda Raquel Smith." In that application, Smith stated that he wishes to assume the name of "Amanda Raquel" because he is emotionally and psychologically a female and considers himself a female.  In support of his name change application, Smith notified staff in the NJSP Business Office of his application so that a check could be issued to the newspaper to advertise the hearing to change his name.  Smith placed a newspaper advertisement to inform the public of the hearing on his application to change his name to "Amanda Raquel Smith." On January 29, 2009, the state court denied Smith's application for a name change.

On January 26, 2009, Smith filed another IRSF with the NJSP Administration seeking hormonal treatments for GID and asking to receive women's clothing and amenities.  On February 25, 2009, Smith filed his second appeal of an NJSP Administrative Decision with the Superior Court of New Jersey, Appellate Division.  In his appeal, Smith wrote that he prefers to be called by the feminine name of "Amanda Raquel Smith."  He also included a copy of his January 4, 2008 letter to Dr. DeFilippo, which is signed as "Amanda Raquel Smith," and which contained his demand for female hormone therapy and women's clothing and amenities, including sanitary napkins and women's underwear.  The appeal also contained his mental health treatment plan dated June 4, 2008, the December 5, 2008 complete psychiatric evaluation of his GID claim and handwritten questions to Dr. Moshkovich that included graphic references to anal masturbation and castration among other topics.

On January 6, 2011, Smith wrote to defense counsel in this action advising that on August 30, 2010, both the CBS 3 News and its sister station Eyewitness News on CW aired television broadcast segments about Smith's lawsuit to become a female.  The letter also informed defense counsel that the newspapers, "The Press of Atlantic City" and "The Star Ledger," published newspaper articles sometime between August 27, 2010 and September 4, 2010, concerning his lawsuit.  (Ex. M).

## II.   DISCUSSION

A.  Standard for Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1219, n. 3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 (1989); Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)(noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).

Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon
> the mere allegations or denials of the adverse party's
> pleading, but the adverse party's response, by affidavits or
> as otherwise provided in this rule, must set forth specific
> facts showing that there is a genuine issue for trial. If
> the adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). The rule does not increase or decrease a
party's ultimate burden of proof on a claim. Rather, "the
determination of whether a given factual dispute requires
submission to a jury must be guided by the substantive
evidentiary standards that apply to the case." Anderson, 477
U.S. at 255.

Under the Rule, a movant must be awarded summary judgment on
all properly supported issues identified in its motion, except
those for which the nonmoving party has provided evidence to show
that a question of material fact remains. See Celotex, 477 U.S.
at 324. Put another way, once the moving party has properly
supported its showing of no triable issue of fact and of an
entitlement to judgment as a matter of law, for example, with
affidavits, which may be "supplemented ... by depositions,
answers to interrogatories, or further affidavits," id. at 322 n.
3, "its opponent must do more than simply show that there is some
metaphysical doubt as to the material facts." Matsushita, 475
U.S. at 586 (citations omitted); see also Anderson, 477 U.S. at
247–48 (stating that "[b]y its very terms, this standard provides
that the mere existence of *some* alleged factual dispute between
the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no
*genuine* issue of *material* fact.").

What the nonmoving party must do is "go beyond the pleadings
and by [its] own affidavits, or by the 'depositions, answers to
interrogatories, and admissions on file,' designate 'specific
facts showing that there is a genuine issue for trial.'"
<u>Celotex</u>, 477 U.S. at 324; <u>see also</u> <u>Lujan v. National Wildlife
Fed'n</u>, 497 U.S. 871, 888 (1990)(stating that "[t]he object of
[Rule 56(e)] is not to replace conclusory allegations of the
complaint ... with conclusory allegations of an affidavit.");
<u>Anderson</u>, 477 U.S. at 249; <u>Big Apple BMW, Inc. v. BMW of N. Am.,
Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992), <u>cert</u>. <u>denied</u>,507 U.S.
912 (1993)(stating that "[t]o raise a genuine issue of material
fact, ... the opponent need not match, item for item, each piece
of evidence proffered by the movant," but must "exceed[ ] the
'mere scintilla' threshold and ... offer[ ] a genuine issue of
material fact.").

The Local Civil Rules supplement the Federal Rules of Civil
Procedure and provide that "each side shall furnish a statement
which sets forth material facts as to which there exists or does
not exist a genuine issue." <u>L. Civ. R.</u> 56.1. "Where possible, a
single joint Rule 56.1 statement is favored." Allyn Z. Lite, New
Jersey Federal Practice Rules 192 (2006 ed.) (citations omitted).
"Where a joint statement is not prepared, then, under the rule,
'facts submitted in the statement of material facts which remain
uncontested by the opposing party are deemed admitted.'" <u>Id</u>. at

193 (citations omitted).  However, "the parties' statements
pursuant to Local Rule 56.1 "cannot bind the Court if other
evidence establishes that the stipulated facts are in error."
Id. (citation omitted).

B.  Failure to Exhaust Administrative Remedies

     Defendants first argue that Smith failed to properly exhaust
his administrative remedies with respect to his breach of privacy
claim.  Smith counters that the privacy issue was raised by him
on February 26, 2008, when he wrote in Part Four of the IRSF, in
response to the Staff member's response: "IM Smith is unable to
speak to said psychiatrist due to lack of privacy and
confidentiality, in part because 1) the unit officer sits nearby
(at hearing distances); 2) the unit microphones being "on"; and
3) she went to IM Smith to discuss [her] issues out in the wide
open of the unit.  Would like privacy and confidentiality to
freely speak."

     In accordance with N.J.A.C. 10A:8-1.1 to 10A:8-3.6, the NJSP
has adopted Inmate Handbooks in 2001 and 2007, that set forth the
rights and privileges of its inmates at NJSP.  The Inmate
Handbook also sets forth the inmate grievance procedure at NJSP,
which includes the procedures for inmates to submit a complaint,
problem or suggestion to the attention of the administration at
NJSP.  The Inmate Handbook is available to inmates when they go
to the NJSP law library.

     In particular, N.J.A.C. 10a:1-4.1 establishes a
comprehensive Inmate Remedy System in which inmates may formally

communicate with correctional facility staff to request information, and present issues, concerns, grievances, complaints or problems to the correctional facility staff.  N.J.A.C. 10A:1-4.4(e) provides an Inmate Remedy System Form ("IRSF") "must be complete, legible and include a clear and concise statement summarizing the request."

N.J.A.C. 10A:1-4.5(d) provides that an inmate "shall choose either a 'Routine Inmate Request' or an 'Interview Request' to fully exhaust the initial step of the Inmate Remedy System prior to submitting an Administrative Appeal."  An inmate may appeal a response after he has exhausted the initial step of the Inmate Remedy System.  N.J.A.C. 10A:1-4.6(a).  Defendants specifically refer to N.J.A.C., 10A:1-4.4(d), which provides: "The comprehensive Inmate Remedy System to include a 'Routine Inmate Request' and/or 'Interview Request,' and an 'Administrative Appeal' must be utilized and fully exhausted prior to an inmate filing any legal action regarding information requests, issues, concerns, complaints, or problems."

The relevant statute, 42 U.S.C. § 1997e(a), provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or

some other wrong." <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002)
(citation omitted). <u>See also</u> <u>Daniels v. Rosenberger</u>, 386 Fed.
Appx. 27, 29 (3d Cir. 2010)("[u]nder the Prison[ ] Litigation
Reform Act, a prisoner must exhaust available administrative
remedies before bringing suit concerning prison
conditions")(citing 42 U.S.C. § 1997e(a)).  Exhaustion is
mandatory.  A prisoner must exhaust all available administrative
remedies even where the relief sought, such as monetary damages,
cannot be granted through the administrative process. <u>Booth v.
Churner</u>, 532 U.S. 731 (2001).

Section 1997e(a) requires "proper exhaustion," as that term
is used in administrative law. <u>Woodford v. Ngo</u>, 548 U.S. 81,
90-93 (2006).  "Proper exhaustion demands compliance with an
agency's deadlines and other critical procedural rules." <u>Id</u>. at
90-91.  Compliance with the prison grievance procedures is all
that is required for "proper exhaustion."  "The level of detail
necessary in a grievance to comply with the grievance procedures
will vary from system to system and claim to claim, but it is the
prison's requirements ... that define the boundaries of proper
exhaustion."[4] <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007)(holding

---

[4]  In <u>Concepcion v. Morton</u>, 306 F.3d 1347 (3d Cir. 2002),
the Third Circuit addressed the issue of whether the grievance
procedure in an inmate handbook promulgated by a NJDOC state
prison, but not formally adopted by the State Department of
Corrections, constituted an administrative remedy for purposes of
Section 1997e(a) of the PLRA.  Though the grievance procedure at
issue was deemed a "relatively informal [one] ... established by
the prison administrators of the NJSP and published in the
Department of Corrections Inmate Handbook[,]" the process was
considered an "administrative remedy" within the meaning of the

exhaustion was not per se inadequate simply because the individual later sued was not named in grievance, where prison policy did not require prisoner to identify particular responsible party); see Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004)(prison grievance procedures supply yardstick for determining required steps for exhaustion).

The exhaustion requirement includes a procedural default component. See id. at 230. A court may consider extrinsic materials for determining whether a procedural default should be excused. See Williams v. Beard, 482 F.3d 637 (3d Cir. 2007). Exhaustion is a requirement even where the prisoner seeks a remedy that the administrative grievance process does not or cannot provide, such as monetary damages. Woodford, 548 U.S. at 85. The Third Circuit came to the same conclusion several years earlier when it found that no "futility exception" exists which would excuse a failure to exhaust remedies even when the remedy

---

PLRA for several reasons. Id. at 1352-54. First, it gave inmates the opportunity to inform prison administration about any complaints. Second, it provided for written responses to inmates. Third, the written responses were subject to review by supervisors. Fourth, final resolutions required signatures by multiple administrative parties. Id. at 1354. Important in the Third Circuit's calculus was the fact that the grievance procedure at issue furthered an important goal of the PLRA: providing a forum through which inmates could potentially resolve their disputes, thereby reducing the quantity of prisoner litigation. Id. at 1354-55. Furthermore, "[f]or cases ultimately brought to court, the remedy form submitted by the inmate and the written response provided by the prison administration could facilitate adjudication by clarifying the contours of the controversy." Id. at 1354-55 (citing Porter, 534 U.S. at 525). Whether or not an administrative remedy is formally adopted by a State Department of Corrections is "irrelevant to these rationales for exhaustion." Id. at 1354.

sought is unavailable.  Nyhuis v. Reno, 204 F.3d 65, 71 (3d Cir. 2000).

As recognized by the Supreme Court, the PLRA serves multiple purposes.  "Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits[.]"  Porter v. Nussle, 534 U.S. at 524.  The PLRA affords corrections officials with "time and [an] opportunity to address complaints internally before allowing the initiation of a federal case."  Id. at 525.  By providing this opportunity to administratively remedy an inmate grievance, it may be possible to "obviat[e] the need for litigation."  Id. at 525 (citing Booth v. Churner, 532 U.S. at 737).  In other cases, the administrative review process may serve to "filter out some frivolous claims [.]"  Booth, 532 U.S. at 737.  Importantly, the PLRA applies not only to "prison conditions" as per the plain text of the statute, but also to "occurrences" affecting prisoners and "prison life" in general.  Porter, 534 U.S. at 521, 532.

The undisputed facts in this case demonstrate that Smith did in fact raise his privacy claim in his IRSF, at Part Four of the form.  This issue was addressed by the Appellate Division on plaintiff's administrative appeal.  Consequently, this Court finds that dismissal of this action for failure to fully exhaust administrative remedies is not appropriate because the goal of this requirement has been met.  The NJSP officials had the time and opportunity to address plaintiff's complaint internally before Smith filed this federal action.  Therefore, summary

judgment is not appropriate in favor of the defendants on this
ground.

C.  Issue Preclusion

Defendants next contend that they are entitled to summary
judgment on the basis of issue preclusion or collateral estoppel
because the violation of privacy claim has been previously
litigated in the Superior Court of New Jersey, Appellate
Division.

Collateral estoppel or issue preclusion prevents parties or
their privies from re-litigating an issue if a court possessing
personal and subject matter jurisdiction has already delivered a
valid, final judgment on the merits.  Witkowski v. Welch, 173
F.3d 192, 198-99 (3d Cir. 1999).  The purpose of the collateral
estoppel doctrine is to promote judicial consistency, encourage
reliance on court decisions, and protect defendants from being
forced to repeatedly relitigate the same issues in multiple
lawsuits.  Allen v. McCurry, 449 U.S. 90, 94 (1980).  See also
Swineford v. Snyder County, Pennsylvania, 15 F.3d 1258, 1266 (3d
Cir. 1994)(the intent of issue preclusion is that "a losing
litigant deserves no rematch after a defeat fairly suffered, in
adversarial proceedings, on an issue identical in substance to
the one he subsequently seeks to raise.").

The standard requirements for collateral estoppel, or issue
preclusion, as set forth by the Third Circuit, include: (1) the
identical issue was previously adjudicated; (2) the issue was

actually litigated;[5] (3) the previous determination was necessary
to the decision; and (4) the party being precluded from
relitigating the issue was fully represented in the prior action.
Szehinskyj v. Att'y Gen. of U.S., 432 F.3d 253, 255 (3d Cir.
2005)(citing Henglein v. Colt Indus. Operating Corp., 260 F.3d
201, 209 (3d Cir. 2001), cert. denied, 535 U.S. 955 (2002); and
Raytech Corp. v. White, 54 F.3d 187, 190 (3d Cir. 1995), cert.
denied, 516 U.S. 914 (1995))(citation omitted). See also
Witkowski, 173 F.3d at 199; Iseley v. Talabar, 232 Fed. Appx. 120
(3d Cir. 2007)(addressing the four factors as (1) the issue
sought to be precluded is the same as that involved in the prior
action; (2) the prior action resulted in a final judgment on the
merits; (3) the party against whom collateral estoppel is
asserted was a party to the prior action; and (4) the party
against whom collateral estoppel is asserted had a full and fair
opportunity to litigate the issue in the prior action).

The undisputed facts show that the very same privacy claim
was raised by Smith in his administrative appeal before the
Superior Court of New Jersey, Appellate Division.  In that
action, the Appellate Division held that:

> the record is devoid of facts supporting appellant's
> contentions that a gratuitous disclosure occurred.  Dr.
> Moshkovich acknowledged she discussed appellant's GID
> disclosure with her supervisors when discussing her
> evaluation and treatment.  Such discourse among the unit
> psychiatrists is necessary to devise an appropriate course

---

[5]  "Actually litigated" means properly raised in an earlier
lawsuit, submitted to the court for a determination, and
determined.  Black's Law Dictionary (9th ed. 2009).

of treatment for an inmate.  This record reflects several
doctors were involved in appellant's mental health care.
These discussions can hardly be characterized as a breach of
appellant's constitutional right to privacy.  Likewise,
nothing shows the doctors then revealed the transgender
identity issue to the Housing Unit Officers.  The claims are
nothing more than mere speculation and supposition and are
rejected.

(August 27, 2010 Appellate Division Opinion at ex. K).

Smith's prior action in the Appellate Division resulted in a

final judgment on the merits against Smith and the New Jersey

Supreme Court declined to grant certification.  Moreover, Smith

had a full and fair opportunity to litigate the violation of

privacy claim he raised in state court.  Consequently, he is

barred by the doctrine of collateral estoppel from relitigating

the identical claim in this action.

Smith wrongly asserts in his opposition that defendants fail

to satisfy several of the factors for collateral estoppel to

apply.  Namely, he asserts that defendants have not demonstrated

that the party against whom collateral estoppel is asserted was a

party to the prior action or that the party against whom

collateral estoppel is asserted had a full and fair opportunity

to litigate the issue in the prior action.  (Plaintiff's Repl,

Docket entry no. 86 at pg. 11).  Smith argues that his appeal was

against the NJDOC and not the individual defendants now remaining

in this action.

Defendants correctly address plaintiff's error in their

reply brief.  Quite simply, Smith misapprehends these elements of

collateral estoppel as it is the plaintiff, Smith himself,

against whom the doctrine is asserted and he was most certainly a party to the Appellate Division action and had a full and fair opportunity to litigate this issue in that prior action.

Therefore, this Court finds that the doctrine of collateral estoppel applies in this case, and the defendants, Moshkovich, Baldwin and Ricci, are entitled to summary judgment on the violation of privacy claim on the basis of issue preclusion.  As the violation of privacy claim is the only claim asserted against defendants, Moshkovich and Baldwin, the Complaint will be dismissed with prejudice in its entirety as against these two defendants.

D.   No Constitutional Violation with Respect to Privacy Claim

Defendant Ricci also asserts that she is entitled to summary judgment on plaintiff's violation of privacy claim because plaintiff has only a limited right to privacy in prison.

The Supreme Court has held that prison inmates do not shed all fundamental protections of the Constitution at the prison gates. Wolff v. McDonnell, 418 U.S. 539, 555 (1974).  Inmates retain those rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system.  Pell v. Procunier, 417 U.S. 817, 822 (1974).

Specifically, an inmate's constitutional right may be curtailed by a policy or regulation that is shown to be "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987).  Courts must respect the administrative concerns underlying a prison regulation, without

requiring proof that the regulation is the least restrictive means of addressing those concerns.  In determining whether a particular restriction is justified by correctional goals, a court analyzes four factors under the Turner analysis as follows:

> [Turner] directs courts to assess the overall reasonableness of such regulations by weighing four factors.  First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and this connection must not be so remote as to render the policy arbitrary or irrational. Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally.  And fourth, a court must consider whether there are alternatives to the regulation that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000)(en banc)(internal quotations omitted).

In context of Smith's privacy claim in this case, the Supreme Court of the United States has recognized that there exists in the United States Constitution a right to privacy protecting "the individual interest in avoiding the disclosure of personal matters."  Whalen v. Roe, 429 U.S. 589, 599 (1977).  See also Doe v. Delie, 257 F.3d 309, 315 (3d Cir. 2001); Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994).  Thus, while prisoners are divested of many significant constitutional rights as a result of their status, their limited right of privacy has been extended to cover medical information regarding inmates. See Doe v. Delie, 257 F.3d at 317; Powell v. Shriver, 175 F.3d 107, 112-13 (2d Cir. 1999).  This narrow constitutional right

applies in the case of an unusual medical condition which, if
disclosed unnecessarily, would likely expose the inmate to
ridicule, discrimination, or even potential violence and harm,
particularly when word of the condition is likely to spread
through "humor or gossip[ .]"  Powell, 175 F.3d at 112.
Transsexualism or transgender disorder, such as Smith's alleged
condition here, has been found to be a sufficient condition to
trigger this qualified right of privacy.  See Powell, 175 F.3d at
112-13.

However, the United States Court of Appeals for the Third
Circuit recognized in Doe v. Delie that this limited
constitutional right to privacy "is subject to substantial
restrictions and limitations in order for correctional officials
to achieve legitimate correctional goals and maintain
institutional security."  Doe v. Delie, 257 F.3d at 317.  Any
policy or regulation that curtails such right must be "reasonably
related to legitimate penological interests," as set forth in
Turner, 482 U.S. at 89.

In Powell, the court noted that it was not difficult to
imagine the circumstances under which disclosure of an inmate's
HIV-positive status would further legitimate penological
interests, such as prevention of contagion.  However, the court
found it harder to think of circumstances in which disclosure of
an inmate's transgender condition, which is not contagious, would
serve a legitimate penological purpose.  Given the sexually-

40

charged atmosphere of most prisons, such disclosure might lead to
inmate-on-inmate violence.  Powell, 175 F.3d at 112-13.

Here, Smith relies on Hunnicutt v. Armstrong, 152 F. App'x
34 (2d Cir. 2005)(unpublished decision), vacating in part, 305 F.
Supp.2d 175, 187-188 (D. Conn. 2004), in opposition to
defendant's motions for summary judgment.  In Hunnicutt, the
United States Court of Appeals for the Second Circuit held that
Hunnicutt adequately alleged federal constitutional and state law
right to privacy claims, based on his allegations that defendants
violated privileged communications by discussing plaintiff's
mental health issues on the tier in the presence of other
inmates, and allowing non-health staff access to plaintiff's
confidential health information.  Hunnicutt, 152 F. App'x at 35.

The problem with Smith's argument, however, is that there is
no evidence to support his allegation that any of the defendants,
Dr. Moshkovich, Ms. Baldwin or Administrator Ricci divulged
plaintiff's GID claim improperly.  This finding was made by the
Appellate Division as set forth above.  At most, Moshkovich and
Baldwin discussed plaintiff's alleged GID with his mental health
team only.  There is absolutely no evidence that these defendants
improperly disclosed plaintiff's GID to non-medical staff.  See
Allah v. Hayman, et al., 2010 U.S. Dist. LEXIS 26476 (D.N.J.
March 22, 2010)(finding that an inmate's right to privacy in
prison is limited to instances when private medical information

was improperly disclosed).[6]  Moreover, the evidence shows that every precaution was made to balance Smith's privacy concerns with the prison's legitimate penological objectives in providing safety and security to inmates and staff.  See Doe v. Delie, 257 F.3d at 317.

Moreover, Smith himself disclosed this private medical information within NJSP in several manners.  He filed an application in state court to have his name changed to a feminine name.  To facilitate this application, Smith had to notify non-medical staff in the NJSP Business Office to issue a check to the newspaper to advertise his name change.  Smith even admitted that he had asked other inmates at NJSP to call him "Amanda."  (Smith Dep. 55:14-20, Ex. A).  Smith has requested not only treatment and hormone therapy for GID, but also has asked for women's clothing and amenities, including sanitary napkins.  Thus, Smith's protests that his privacy has been violated by these

---

[6]  In Allah, Judge Thompson reasoned: "While disclosing the results of a routine test may violate the Fourteenth Amendment, merely conducting that test in a public setting does not result in the disclosure of any confidential information.  Furthermore, the fact that various prison personnel may have asked Plaintiff about medical information in a public setting does not of itself violate any confidentiality.  Plaintiff apparently refused to discuss his medical conditions in public, as was his right.  Defendants would only have violated Plaintiff's privacy rights if they disclosed confidential information.  There are no allegations of such disclosure."  Allah, 2010 U.S. Dist. LEXIS 26476 at *12-13.

defendants is inconsistent with his own voluntary actions and efforts to publicize his gender identity issue.[7]

Therefore, this Court concludes that Smith has not demonstrated a violation of his privacy rights of constitutional dimension, and accordingly, the defendants, Moshkovich, Baldwin and Ricci are entitled to summary judgment on this claim.

E.   Retaliation Claim

Defendant Ricci also argues that Smith has failed to make the requisite showing to support his claim of unconstitutional retaliation.  Specifically, Smith has alleged that Ricci violated his rights by changing his housing assignment in retaliation for filing grievances.

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution ... ."  White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990).  To prevail on a retaliation claim, plaintiff must demonstrate that (1) he engaged in a constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse

---

[7]  This Court finds the parties' arguments concerning waiver of privacy by Smith due to his disclosure to television media and newspapers after this matter had been in litigation to be irrelevant in its determination.  As rightly pointed out by plaintiff in his opposition brief, this occurred well after this lawsuit was filed.  Moreover, plaintiff states that he did not disclose his case to the public media, and states that the false information contained in their segments and articles supports the fact that he did not disclose his case to the media.  Finally, because plaintiff voluntarily disclosed his GID issue well before these media events occurred, the Court finds any media disclosure to be unnecessary and superfluous in its determination on this issue.

action "sufficient to deter a person of ordinary firmness from
exercising his [constitutional] rights;" and (3) the protected
activity was a substantial or motivating factor in the state
actor's decision to take adverse action.  Rauser v. Horn, 241
F.3d 330, 333 (3d Cir. 2001) (quoting Allah v. Seiverling, 229
F.3d 220, 225 (3d Cir. 2000)).  See also Anderson v. Davila, 125
F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist.
Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)); Thaddeus-X v.
Blatter, 175 F.3d 378, 386-99 (6th Cir. 1999), cited with
approval in Allah, 229 F.3d at 225.

     As to the first factor, there is no dispute that the filing
of grievances is a constitutionally protected activity.  See
Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d cir. 1981).  As to
the second factor, "a prisoner-plaintiff satisfies [the "adverse
action"] requirement by demonstrating that the action 'was
sufficient to deter a person of ordinary firmness from exercising
his [constitutional] rights.'" Rauser v. Horn, 241 F.3d 330, 333
(3d Cir. 2001)(quoting Allah v. Seiverling, 229 F.3d at 225).
Determination of this second factor is a fact-sensitive analysis.
Allah, supra.

     Finally, as to the third factor, plaintiff has the initial
burden of showing that his conduct "was 'a substantial or
motivating factor'" in the adverse action.  Rauser, 241 F.3d at
333 (importing a burden-shifting framework into the prisoner-
retaliation context for proof of a "causal link between exercise
of [an inmate's] constitutional rights and the adverse action

taken against him").  To establish this requisite causal
connection for a First Amendment retaliation claim, the plaintiff
must prove one of two things: "(1) an unusually suggestive
proximity between the protected activity and the allegedly
retaliatory action; or (2) a pattern of antagonism coupled with
timing to establish a causal link."  DeFranco v. Wolfe, 387 Fed.
Appx. 147, 154 (3d Cir., July 14, 2010)(citing Lauren W. Ex rel.
Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)).  If
neither of these showings is made, then plaintiff must show that,
from the evidence in the record as a whole, the trier of fact
should infer causation.  Id.

The burden then shifts to the defendant, who must "prove by
a preponderance of the evidence that it would have taken the same
... action even in the absence of the protected activity."
Rauser, 241 F.3d at 334.  This is a "deferential standard" meant
to take into account "that the task of prison administration is
difficult, and that courts should afford deference to decisions
made by prison officials ... who possess the necessary
expertise."  Id.  "[R]easons reasonably related to a legitimate
penological interest" are a sufficient basis for defendants to
have taken the action against the inmate.  Id., 241 F.3d at 334
(citing Turner v. Safley, 482 U.S. 78, 89 (1987)).  Maintaining
prison safety and security is a fundamental, legitimate
penological interest.  See, e.g., Jones v. Brown, 461 F.3d 353,
361-62 (3d Cir. 2006).

In this case, defendant Ricci first argues that as an
inmate, Smith does not have a protected liberty interest in
obtaining or retaining a particular housing assignment.  See
Meachum v. Fano, 427 U.S. 215, 224-25 (1976)(holding that the due
process clause does not protect an inmate from transfer from one
institution to another, even where the degree of confinement in
one prison may be different from that in another).  See also
Sandin v. Connor, 515 U.S. 472, 479 (1995).  Thus, Smith cannot
show that Ricci subjected him to any adverse action, the second
factor to prove retaliation.  Because Smith has no protected
constitutional right to a housing assignment, he cannot claim
"adverse action" when his housing assignment was changed.

Smith also has not shown the third factor, namely, that his
filing of grievances and complaints was the substantial or
motivating factor that caused defendant to take any alleged
adverse action against plaintiff.  Defendant has demonstrated
that Smith's move from a single cell to double cell was simply
the result of the operational requirements of NJSP.  (Hutton
Declaration at ¶ 12).  Further, Smith has not shown that he was
deterred in any way from filing grievances or pursuing this
protected constitutional activity.  In fact, as the record shows,
Smith continued to use correspondence, grievance forms and court
complaints to address his issues and concerns.  He has not shown
that his access to courts was chilled in any way.  Smith also has
not alleged any harm or injury as a result of his transfer to a
double cell.  Thus, the single purported action by Ricci in

46

changing plaintiff's housing assignment fails to demonstrate sufficiently adverse action against plaintiff in violation of his constitutional rights.  See Burgos v. Canino, 358 F. App'x 302, 307 (3d Cir. 2009)(urinalysis, harassment, threats, temporary inconveniences, and denial of recreation did not rise to the level of adverse action against prisoner); Walker v. Bowersox, 526 F.3d 1186, 1190 (8th Cir. 2008)("the two incidents when Knarr directed others to give Walker an alternative meal, although purportedly retaliatory, were not sufficiently severe to amount to a constitutional violation"); Gill v. Tuttle, 93 F. App'x 301, 303-04 (2d Cir. 2004)(to establish retaliation claim, inmate must allege adverse action that imposes a substantial impact on inmate).  See also Potter v. Fraser, 2011 WL 2446642, *8 (D.N.J. June 13, 2011)(finding that plaintiff's allegations that certain defendants searched his cell on two occasions, threw his t-shirt in the garbage, and confiscated his commissary purchases, in retaliation for filing grievances, were not sufficiently adverse actions).

Accordingly, summary judgment will be granted in favor of defendant Ricci with respect to the retaliation claim.

F.  Official Capacity Claim

Next, defendant Ricci argues that plaintiff's claims against her in her official capacity must be dismissed because such claims are barred by the Eleventh Amendment and because the defendant, in her official capacity is not a "person" subject to suit under 42 U.S.C. § 1983.

The Eleventh Amendment to the United States Constitution provides that, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." As a general proposition, a suit by private parties seeking to impose liability which must be paid from public funds in a state treasury is barred from federal court by the Eleventh Amendment, unless Eleventh Amendment immunity is waived by the state itself or by federal statute.  See, e.g., Edelman v. Jordan, 415 U.S. 651, 663 (1974).  The Eleventh Amendment protects states and their agencies and departments from suit in federal court regardless of the type of relief sought.  Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100 (1984).  Thus, based on the doctrine of sovereign immunity, states cannot be sued in federal court, unless Congress has abrogated that immunity or the State has waived it.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989).

Similarly, absent consent by a state, the Eleventh Amendment bars federal court suits for money damages against state officers in their official capacities.  See Kentucky v. Graham, 473 U.S. 159, 169 (1985).  This immunity extends to state agents or officials when the "action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to sovereign immunity from suit even though individual officials are nominal defendants."  Regents of

the Univ. of Cal. v. Doe, 519 U.S. 425, 431 (1997).  Section 1983
does not override a state's Eleventh Amendment immunity.  Quern
v. Jordan, 440 U.S. 332 (1979).  Therefore, "[a]s a matter of
law, suits against individuals acting in their official
capacities are barred by the Eleventh Amendment."  Holland v.
Taylor, 604 F. Supp.2d 692, 699 (D. Del.  2009).  See also Davis
v. New York, 316 F.3d 93, 101 (2d Cir. 2002).

    Here, to the extent that Smith alleges that defendant Ricci
was acting in her official capacity, his claims against defendant
would essentially be against the state.  Further, there is no
indication here that either abrogation or waiver is applicable to
Smith's claims.   Therefore, sovereign immunity works to bar the
federal claims in this suit against defendant Ricci in her
official capacity.  Title 28 U.S.C. § 1915(e)(2)(B)(iii) requires
this Court to dismiss the claims if they "seek[ ] monetary relief
from a defendant who is immune from such relief."

    Beyond sovereign immunity, the § 1983 Complaint is invalid
against Ricci because defendant, in her official capacity, is not
a "person" under § 1983.  See Quern v. Jordan, 440 U.S. 332, 345
(1979)("[A] state is not a 'person' for purposes of 42 U.S.C. §
1983.");  Hafer v. Melo, 502 U.S. 21, 25 (1991)("Suits against
state officials in their official capacity ... should be treated
as suits against the state.").   See Hussein v. New Jersey, Civil
No. 09-1291 (JBS), 2010 WL 376609, at *4 (Jan. 26, 2010)
(dismissing a Section 1983 claim against the State of New Jersey

and Corzine as the state and state officials in their official capacities are not persons for Section 1983 purposes).

Therefore, the Court will grant defendant Ricci's motion for summary judgment on this ground, and accordingly dismiss the Complaint against defendant Ricci in her official capacity.

I.   <u>Remaining Arguments</u>

Because this Court has determined that defendants are entitled to summary judgment with respect to plaintiff's remaining claims in his Complaint, there is no need to address defendants' arguments concerning qualified immunity or punitive damages.

III.   <u>CONCLUSION</u>

Therefore, for the reasons set forth above, the motion by defendants, Dr. Moshkovich, Ms. Baldwin and Administrator Ricci, for summary judgment, pursuant to <u>Fed.R.Civ.P.</u> 56, will be granted, and the Complaint will be dismissed with prejudice, in its entirety, with respect to these defendants.  An appropriate order follows.


                                        *s/Peter G. Sheridan*
                                        PETER G. SHERIDAN, U.S.D.J.

March 30, 2012